**SEABOARD SURETY COMPANY, Appellant,**

v.

**FIRST NATIONAL BANK OF MONTGOMERY, as Executor of the Estate of Algernon Blair, deceased, Appellee.**

**No. 17112.**

United States Court of Appeals Fifth Circuit.

March 5, 1959.

James A. Dixon, Joseph F. Jennings, Miami, Fla., London & Yancey, Birmingham, Ala., and Dixon, DeJarnette, Bradford & Williams, Miami, Fla., for appellant.

Earl D. Waldin, Jr., Miami, Fla., Fred Ball, Ball & Ball, Montgomery, Ala., and Smathers, Thompson & Dyer, Miami, Fla., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

This action was transferred pursuant to 28 U.S.C.A. § 1404(a) from the Middle District of Alabama to the Southern District of Florida. See In re First National Bank of Montgomery, 5 Cir., 1956, 233 F.2d 876. Plaintiff's testator, Algernon Blair, had entered into a contract with Sigsbee Park, Inc., to construct a Federal Housing Administration project at Key West, Florida, known as Sigsbee Park A and B. Blair had subcontracted the electrical work on the project to William Hepburn Company,

Inc., for which appellant was surety on a performance bond conditioned for the faithful performance of the work and the furnishing of the labor and material required by said subcontract.

The subcontract called for all conduit that was to be embedded in concrete to be rigid conduit with threaded connectors and there was no written change order on that requirement. In fact, however, the electrical subcontractor used on most of the work a much cheaper thin-wall conduit. Its surety, the appellant, contended that the change was authorized verbally and that it was acquiesced in by all interested parties. Those issues were submitted to the jury which returned a general verdict against the defendant, and appellant now candidly concedes that the jury's verdict on those issues is conclusive. Its contention is that the plaintiff, appellee, also bore the burden of showing a causal relationship between the substitution of materials in violation of the contract and the damages complained of, that there was no evidence of any such causal relationship and, hence, that the district court erred in refusing defendant's motion for a directed verdict and for judgment *non obstante veredicto*.

On June 13, 1953, approximately nine months after the work had been completed, Hoyt M. Zilen, Construction Examiner for the F.H.A., conducted the "First Guarantee Inspection." Actually, he inspected only 25% of the buildings. "While only a fourth of the buildings have been covered in making up this report, it is felt that sufficient inspections have been made since the buildings are all similar and troubles follow the same pattern for each type structure." He reported to the Chief Architect, F.H.A., Coral Gables, Florida:

"7. Rust Spots, Rusted Elect. Conduit

"Rust spots are still prevalent in the ceilings of buildings in which the legs of the chairs for reinforcing steel were allowed to touch the supporting forms. While there are a few rust spots in nearly all build-

ings, the majority are confined to the multiple units and duplexes along Felton Road.

"In multiple units the electrical conduits can be traced by cracks in the floors and ceilings. In some of the worst places, which usually occur in kitchin (sic) ceilings, the rusting conduit has broken away the concrete so that chips have fallen out.

"Chipping and patching is required."

On July 16, 1953, the Director of the F.H.A. advised the estate of Algernon Blair:

"This is to advise that the First Guarantee Inspection was made recently, and immediate correction of the following listed items is required:

" *       *       *       *       *

"6. Rusted Electric Conduit

"All kitchen ceilings where the electric conduit has cracked and spalled, chip out; remove the rusted conduit and replace with plastic conduit, patching and painting the area."

The Hepburn Company refused to do the corrective work required and Blair's estate had it done at a cost probably in excess of the amount of the jury's verdict of $60,750 plus 6% interest from May 28, 1954.

The district court thus analyzed the issues for the jury's decision:

"Therefore, the questions for the Jury to determine in your deliberations might be:

"1. Has the plaintiff, that is the bank, shown by a preponderance of the credible evidence that there was a breach of the condition of the bond, in that Hepburn Company, Inc., failed either well and fully to perform the work, or to furnish the materials required by the subcontractor?

"2. If so—if you find the above —has the defendant, the Seaboard Surety Company, shown by a pre-

ponderance of the evidence that there was a modification of the obligations of Hepburn Company under the subcontract between Blair and Hepburn Company, either in respect to the materials, or with respect to the performance of the work, or both, which would excuse any such failure?

"3. If not, has the defendant shown by a preponderance of the evidence that any failure, either in respect to the materials or the performance of the work, or both, not excused by modification, was waived by Algernon Blair through the acquiescence of himself or his agents?

"4. If there was no waiver or modification in either or both respects, then has the plaintiff shown by a preponderance of the evidence that any such failure, not excused by waiver or modification, proximately caused plaintiff any of the damages which plaintiff here seeks?

"5. If so, what damages has the plaintiff shown by a preponderance of the evidence was proximately caused by any such unexcused failure?"

Plaintiff-appellee did not object to the district court's requiring it to prove by a preponderance of the evidence not only that the Hepburn Company had breached its contract by its substitution of materials, but that all of the damages to be recovered were proximately caused by such breach. We find it unnecessary upon this appeal to decide whether those instructions were too favorable to the appellant, or whether, as the appellee now argues, it was entitled to the cost of making the work conform to the specifications and was not restricted to the damages caused by the substitution of materials.

On appellant's sole contention of lack of evidence of causal relationship, we think that there was more than substantial evidence to require the issue to be submitted to the jury. Samples of the thin-wall conduit and of the rigid conduit were introduced in evidence. The

thin-wall conduit has disintegrated, while the condition of the rigid conduit was well described by the witness Seaton: "The conduit was rusty, but was in good condition." No substantial damages appeared at places where rigid conduit was used.

 Defendant-appellant sought to show that the concrete contained too much salt. Fresh water was used in mixing the concrete but aggregate dredged from salt water was used in its mixing. Defendant's expert witnesses gave their opinion that the substitution of materials was not what caused the concrete to spall, but that the cause was salt in the aggregate. The plaintiff did not produce any counter-expert. The jurors were not, however, bound to accept the opinion of defendant's expert witnesses, but had a right to use their own common sense and experience and to draw all reasonable inferences from the physical facts and occurrences.

The judgment is
Affirmed.