**Willie Mae MORRIS**

v.

**UNITED STATES of America and
Lucille E. Robertson.**

**Civ. No. 4603.**

United States District Court
N. D. Texas,
Fort Worth Division.

May 10, 1963.

Fulghum & Grogan, Weatherford, Tex., for plaintiff, Willie Mae Morris.

T. Gary Cole, Jr., Asst. U. S. Atty., Fort Worth, Tex., for defendant, the United States.

Jim Claunch, Fort Worth, Tex., for defendant, Lucille Robertson.

BREWSTER, District Judge.

This controversy had its source in the fact that the wife and the sweetheart of Sgt. Olen R. Morris, the insured under a $10,000 National Service Life Insurance Policy, were not one and the same person, and in the further fact that his attempt to support two major vices was too much for him. The last one brought about his suicide, and the first one furnished the parties for the argument over the proceeds of the policy.

The sweetheart, Lucille Robertson, was the named beneficiary at the time of his death. Willie Morris, his estranged wife, was the beneficiary at the time of the change to Lucille Robertson. Mrs. Morris seeks to recover the proceeds of the policy on the ground that the insured was mentally incompetent to make the change. It is conceded that all regulations were complied with, if the insured was mentally competent, and the Government therefore takes the position of a stakeholder.

This Court has jurisidiction of the subject matter and of the parties. 38 U.S. C.A. § 784.

The only contested question for decision is the fact issue of whether the insured was mentally competent to make the change of beneficiary. The parties agree that the test to be applied is the one laid down in Taylor v. United States, D.C., Ark., 113 F.Supp. 143, affirmed Taylor v. Taylor, 8th Cir., 1954, 211 F.2d 794. The opinion in that case says that for the sake of nationwide uniformity the federal law controls in controversies involving these policies. It recognizes that generally the standard for determining mental capacity in this kind of case is "the same as that necessary to execute a valid will, deed, or contract." 113 F. Supp. at p. 148. More specifically stated, the test is:

"To be capable of effecting a valid change of beneficiary a person should have clearness of mind and memory sufficient to know the nature of the property for which he is about to name a beneficiary, the nature of the act which he is about to perform, the names and identities of those who are the natural objects of his bounty; his relationship towards them, and the consequences of his act, uninfluenced by any material delusions. See 57 Am.Jur., Wills, Section 64; 26 C.J.S. Deeds, § 54(b); Walsh v. Fairhead, Executrix, 215 Ark. 218, 225, 219 S.W.2d 941." (113 F.Supp., at p. 148).

The burden is upon the party asserting mental incapacity to prove that. fact by a preponderance of the evidence. Taylor v. United States, supra.

■ Not only did the plaintiff fail to discharge that burden of proof as to any of the elements of the test above quoted, but the evidence established as a fact that the insured did have the mental capacity to make the change of beneficiary in question.

This case presents a sordid state of facts, with little on either side to appeal to a sense of equity.

■ The plaintiff offered in evidence a number of letters the Sergeant wrote her after their separation. While it may be that the letters cannot be accepted as proof of the truth of the statements contained in them, the issue of the Sergeant's mental capacity makes them material to show the picture as it appeared to him. However, as far as the decision of this case is concerned, it would be the same whether or not the material statements in the letters were regarded as proving the truth of the matters stated. Any mention herein of a "letter" will have reference to one of those above mentioned.

It may be stated at this point that the Court does not know whether the plaintiff produced all of the letters written to her by the Sergeant. The fact that an attempt had been made to obliterate from one of those in evidence a statement injurious to the plaintiff, and the gap of several months between the dates of some of the letters raises some suspicion. The sentence in the letter of July 9, 1960 marked over with ink entirely different from that with which the letter itself was written was read by the Court with the help of a light after the case was taken under advisement. It said, "If you only hadn't become mean when you drank, and if you had stopped drinking when I asked you to, things would have been different."

The insured was a Staff Sergeant stationed at Chenault Air Force Base, Lake Charles, Louisiana, when he committed suicide on April 1, 1961, at the age of forty-one. He had completed nineteen years of military service at the time, and would have been eligible for retirement at the end of his twentieth year. His closest surviving relatives consisted of his widow, an eighty-six year old father, and some brothers and sisters.

Sgt. Morris and the plaintiff, whom he called "Billie", were married on March 1, 1954. The ceremony was certainly no amateur performance. It was hope prevailing over experience. He had been theretofore married and divorced three times. Matrimonially, she was also a three time loser. At least one of her former divorces had been obtained by the husband. There was no child of any of the seven marriages involving the Sergeant or Billie. It is not clear from the evidence whether they solemnized their happy (?) event in a church, after a march down the aisle to the altar to the accompaniment of some well known wedding hymn, or in the office of a justice of the peace to the tune of the less melodious noises usually heard around a county courthouse. However, from all the evidence and from observation of the plaintiff, there is little question that, as the time approached, there was uppermost in her mind: "Aisle-altar-hymn." The marriage was undoubtedly a happy thought, but nothing came of it except trouble.

Billie was in her middle forties, and eight years older than the Sergeant, when she married him in 1954. The evidence in this case and her demeanor during the trial left the impression that her main goal in life was to have some man for a meal ticket. Her marriage appeared to be, not for better or worse, but for more or less. As might have been expected from their disparity of age as she passed the half century mark, he finally decided that he liked the smell of perfume better than that of liniment, and life came between them. He did not have to search far. Lucille, a tall brunet about the same age as the Sergeant, lived only two blocks from him. She had every appearance of being gay; and she could and did help him "whoop it up", to use her words, on festive occasions such as Christmas and New Year's Eve, and possibly at other times when he yielded excessively to his addiction to alcohol. She

had only six handicaps: a husband, Johnny, and five minor children. Johnny was a cook, or as she put it, "in the food service", at the Air Force Base.

The romance began to ripen in May, 1960. On June 11th following, the Sergeant took Billie to the home of her parents in Parker County, Texas. He told her later that before his return to the Air Base, he filed a suit for divorce in Clay County, where he maintained his legal residence. However, his letter of September 21, 1960 says: " * * * I did not file for divorce as I said I would. I only said that because you talk so mean to me. What have I done to make you hate me? * * * " Later letters indicate that a divorce action was filed by him; but it was never brought to trial. Lucille later went to her home in Atlanta, Georgia, where she instituted proceedings for divorce from Johnny, to whom she had been married for seventeen years and by whom she then had five children, 'teen age and younger.

Johnny's first realization of the situation appears to have been when Lucille got home at five o'clock in the morning after having been out with the Sergeant all night. Even though the effect of Lucille's testimony is that her face bore the look of innocence, rather than a smile of content, when she got home that morning, husband Johnny was narrow minded and outraged about the whole thing. One of the Sergeant's letters mentions that Johnny got his "next door naybor" (sic) to call Lucille and talk her "into admitting things." For a while, it appeared that Johnny was "going to throw a shoe." Lucille got a black eye. The Sergeant feared for his life. Finally, Johnny decided to resort to the Louisiana courts for at least a partial solution of his problems, apparently feeling that he could get some satisfaction from cutting Lucille off with little or nothing in the partition of their property. He successfully prosecuted his suit for legal separation. The Sergeant's letter of March 17, 1961 says that Lucille got a poor property settlement—only their furniture and $600 cash.

Billie reacted differently from the way Johnny did. She played it "cool". Somehow, she had managed to arrange matters so that the Sergeant's allotment checks were mailed to her. She was apparently contented as long as she was able to get the money and keep it. Even though the affair between the Sergeant and Lucille was openly admitted in his letters, Billie made it known that she would contest any effort to divorce her. All the credible evidence indicates that her action was not based upon any love for or interest in the Sergeant, or upon any desire to live with him further.

The evidence is not clear in regard to the arrangement whereby Billie got the Sergeant's allotment checks; but the letters indicate that there was some kind of agreement between them. The tenor of the letters is that she kept the money but not the agreement; and that except for a small pittance averaging less than $8 per month, she consistently refused to give him his part under their agreement. His letter of September 21, 1960 stated: "Billie I know that you didn't plan to live up to the agreement we made. I just didn't think you would do that * * * " The one of March 9, 1961 mentioned a promise by her to send him his part of the allotment check. The dominant purpose of most of his letters to her was to get what he referred to as his part of the checks. He tried almost every imaginable way. He threatened, promised, begged, pleaded, offered reconcilation, and made appeals to sympathy. His financial plight is evidenced by the statements in his letters that he was "down to ½ pack of ciggerettes" (sic) and one meal a day; that he was living on peanut butter and cookies; that he had had to get rid of his car; and that his TV was in the pawn shop. One of his letters told her that he had been taken off separate rations and his "pro pay" had been stopped. It said he was drawing only $25 a pay day and that, "It sure is rough trying to live on that." It continued : " * * * I will draw about $25 Wednesday and I will owe the Club $22. I have about $15 coming from

working at the bowling alley, and that has to buy cigs, laundry, soap, floor & shoe polish, drying cleaning & church colliction (sic) so you see I am hurting * * *" In a letter dated shortly before his death, he wrote, "I can't live on what I am making without a part time job and I have to work day and night." His pleas brought no substantial response. A letter written by him almost nine months after their separation charged that she had sent him a total of only $70 from the allotment checks during that period.

Billie was present and testified at the trial. Her failure even to attempt to explain statements in the letters adverse to her gives the portions outlined above some semblance of verity. They are consistent with the other evidence in the case indicating that she was interested, not in the Sergeant, but only in getting what she could out of him. There is no credible evidence that Billie ever showed the Sergeant any kindness or consideration whatever, either by word or deed, at any time after he took her to her parents' home in June, 1960.

On January 3, 1961, the Sergeant went to the office of the Military Affairs Counselor, Personal Affairs Section, on the Air Base, and asked advice of Sgt. Henry M. Gay about changing the beneficiary in his National Service Life Insurance Policy. He was in the proper office talking to the right man to get the information. He explained that he was separated from his wife and did not want her to get the proceeds of his insurance. He inquired whether he had to designate a relative as beneficiary. Sgt. Gay explained to him that while the law required that his nearest relative get his survivor's benefits, he could name a person not related to him as beneficiary under his National Service Life Insurance Policy. Under Sgt. Gay's supervision, he signed the change of beneficiary on the regular form so as to name Lucille. Sgt. Morris was sober and mentally competent when he executed the change of beneficiary.

Sgt. Gay testified in person at the trial. At that time, he had completed his military service and was a ministerial student at Southwestern Theological Seminary in Fort Worth. He was honest, observant and intelligent. He saw nothing about Sgt. Morris that raised any suspicion about his mental capacity.

It would be expected under the circumstances that the Sergeant was under severe mental stress from the beginning of his difficulties until his death. He was constantly under the burden of having a wife who cared nothing for him but would not turn him loose, of having a married woman with five children for a sweetheart, of fearing injury at the hands of her husband, and of being in a strain financially. He sought relief in protracted drunks, and they apparently made him depressive. On January 18, 1961, and again on the following February 2d, he was admitted to the Base Hospital for the purpose of recuperating from crying drunk spells. The diagnosis was in substance that he was suffering from acute situational depression, accompanied by severe stress and "copious alcoholic intakes." The hospital record attributed his troubles to the problems arising out of his estrangement from his wife, of his going with a married woman, and of his fearing trouble with the "woman's husband." On each occasion, he was discharged after only a few days as being able to return to his responsibilities as Sergeant on the Air Base. The report of the Sergeant's last annual complete medical examination at the Base Hospital on August 8, 1960 showed that his psychiatric and neurological evaluations were normal, and certified him as being fit to carry out his duties.

As if he did not have enough troubles, he acquired some more in March, 1961, the last month of his life. His letter of March 5th said that he was working on the night shift at the shop and at the bowling alley in the daytime. On March 17th, he wrote that Johnny had got judgment that day in his suit for legal separation, and that Lucille had received practically nothing in the property settle-

ment. That meant that the Sergeant was faced with the responsibility of having contributed to depriving five little children of the security of a home, or of trying to furnish one for them when he could not make just a fair living for himself. Billie had shown no signs of being willing to go back to him, and yet she was opposed to his getting a divorce. Lucille had begun to give up on him and was having dates with other men. On March 26th, only five days before he shot himself, he wrote, "I am just sobering up from a week drunk, all because I was so stupid as to let her worry me." He was drunk again on March 31st when he went to Lucille's house. When she made him leave, he went to a tavern and called her from a pay telephone booth. It was during that conversation that he took action to relieve himself of his apparently insurmountable problems by committing suicide. He shot himself in the head while he still had Lucille on the telephone, and the wound brought about his tragic end on the following day.

In his position as Sergeant, the insured had a responsibility not only for himself, but for others under him. There is no evidence that he was ever mentally incapable of meeting, or that he ever failed to meet, those responsibilities at any time except when he was under the influence of intoxicants.

On January 3, 1961, Sergeant Morris had sufficient clearness of mind and memory to know the nature of the property for which he was about to name Lucille beneficiary. He fully realized that he was making a change of beneficiary that would transfer the right to the proceeds of the policy from Billie to Lucille. He knew the natural objects of his bounty and his relationship towards them. A person has the legal right to dispose of his property as he may wish, "regardless of the ties of nature or relationship." Green v. Dickson, Tex.Civ. App., 1948, 208 S.W.2d 119, 124, writ ref., n. r. e. There was nothing unnatural about changing the beneficiary from his estranged wife. The only strange thing about it in this case is why he waited from June to January to do it. That kind of matter is one that is usually called to a spouse's attention by his lawyer at the time the decision is made to file a divorce suit. Under the circumstances, Lucille was a natural object of the Sergeant's bounty on January 3, 1961. He was in love with her. Apparently, she was the only woman who showed any interest in him. His conduct had contributed to breaking up her home, thereby confronting her with the serious problem of assuming more than her share of the responsibility for rearing and educating five minor children. If his effort was to arrange some help for the children in the event he died without being able to contribute to them, it was one of the few honorable deeds shown in all the evidence. In view of the circumstances as they existed around January 3, 1961, it would have been natural to assume that the children would benefit from any money their mother got. If those children get any benefit from the proceeds of the policy, they will have earned it the hard way. The plaintiff made some intimation that the Sergeant's eighty-six year old father was the natural object of his bounty. There was no showing that he needed the money. However, a complete answer to that argument is that Billie is not trying to recover anything for the father. She apparently thought it was perfectly normal to leave out the father when she was the beneficiary.

The remaining matter to be determined in applying the test outlined in the Taylor case is whether the change of beneficiary was the product of an insane delusion. In the first mention herein of the Taylor case, reference was made to that portion of the opinion in 113 F. Supp., at p. 148, which said the standard of mental capacity required in cases involving change of beneficiaries is the same as that necessary to execute a valid will, deed or contract. After that statement of the rule, the Court there adopted the following tests quoted from 57 Am. Jur., Wills, Sections 80, 81 and 82, as being applicable also for determining the existence of insane delusions adequate

to set aside a change of beneficiary in a National Service Life Insurance Policy (113 F.Supp., at p. 149):

"'* * * But to avoid a will because the testator entertained a delusion, the delusion must be an insane delusion, and the will must be the product thereof * * *.

"'* * * The essence of an insane delusion is that it has no basis in reason, cannot be dispelled by reason, and can be accounted for only as the product of mental disorder. * * *

"'* * * To constitute a delusion sufficient to invalidate a will, the subject matter must have no foundation in fact, for there is no such thing as a delusion founded upon facts. * * *'"

Knight v. Edwards, 1954, 153 Tex. 170, 264 S.W.2d 692, 696, quotes with approval the further statements from 57 Am.Jur., Section 82, that:

"'* * * Obviously, a testator need not always be right in his deductions in order to avoid being classed as insanely deluded. * * * One cannot be said to act under an insane delusion if his condition of mind results from an inference or a process of reasoning, however illogical, from facts which are shown to exist.'"

It is doubtful if the evidence is sufficient to establish any kind of delusion. The plaintiff did offer lay testimony to the effect that for a while the Sergeant feared that Lucille's husband was going to kill him. The Sergeant's sister said that he told her that the reason he could not come home during the 1960 Christmas holidays was because he was afraid that Johnny would kill him if he got off the Air Base. That apprehension on the part of the Sergeant was certainly not an insane delusion. It did not meet the test that it had "no basis in reason". There was some foundation in fact for it under the circumstances of this case. Even the two expert witnesses offered by the plaintiff did not regard that belief as a delusion.

The decision that there was no insane delusion could well rest on what is said above; but the Sergeant's fear will be better understood if the situation is viewed in the light of what is known about his background.

He was born in Montague County, Texas, and grew up in Clay County, immediately adjoining on the west. He left to join the Army when he was about twenty-two years old. Clay County is in the edge of the "big ranch" country which extends from there westward to the New Mexico border. Although attitudes in his home State have mellowed considerably in the almost two decades since he left it, during the period when he was growing up in Clay County, there existed in the ranch country of Texas what was known as the "unwritten law". Every young man understood it just as well as he knew what the meat course was going to be at ranch headquarters while calves were being "worked" during a roundup. The effect of the "unwritten law" was to make a bad insurance risk out of a man who broke up another man's home and deprived him of the daily association of his wife and children. He usually died suddenly of lead poisonin'. That was a disease contracted the first time the outraged husband and father came in gunshot range of the homebreaker. The husband himself was never plagued with the disease, but he was an almost certain carrier of it. He was usually equipped to give six doses of lead in rapid succession if necessary to produce fatal results. In some cases, the husband was not even indicted; but he was usually brought to trial so that his justification could be made public. The standard story was that the husband armed himself upon a-learnin' of the situation and sought out the other man for an explanation; that the deceased saw him a-comin' and reached for his pistol pocket as if to pull a gun; that in self-defense the husband had to draw, throw down on his "assailant", start a-fannin' his six-shooter and keep a-fannin' it until, as the cases said, "all semblance of danger, real or apparent, viewed from

the defendant's standpoint, had completely disappeared." It made no difference in the outcome of the case if it developed that the deceased was unarmed. During their deliberations, the juries usually found that the law given them in the charge was inadequate to do what they thought was equity. To supply that deficiency, they resorted to the "unwritten law" for the purpose not only of acquitting the husband, but also of endorsing his conduct, of recognizing that it was open season on homebreakers, and of serving notice on each one of them, actual or potential, to stay in his own back yard.

That way of doing things was so widespread and generally accepted that it received recognition, if not something more, in the opinion of that able and beloved West Texas jurist, Associate Justice R. W. Hall, in the case of Swearingen v. Bray, Tex.Civ.App., 1913, 157 S.W. 953, no writ history, from which the following is quoted:

"Appellee filed this suit in the district court of Collingsworth county for damages, based upon adulterous relations between appellant and appellee's wife. The record shows that appellee and wife were married in 1883; that they cohabited and lived happily together until about two years before the filing of this suit; that as a result of their marital relations they became the parents of eight children.

"The alleged criminal conduct during two years has been abundantly shown by both direct and circumstantial evidence. Appellee testified that he caught them in the act more than once. The appellant did not testify, although he was living and present at the trial, and the record shows that he was still living when his supersedeas bond was executed and filed. The fact shows that appellee had rather be plaintiff on the civil docket, submitting his casus belli to the rules governing there, with the appellant attending the trial, than be defendant on the criminal docket with an empty shotgun present in lieu of appellant, and be tried according to the 'unwritten law.' In the light of this record his decision speaks volumes for his forebearance. He has selected the route fraught with the least expense and notoriety, but having a verdict for $1,500 at the end—showing good business judgment. However, reference to the Civil Reports of this state shows it to be a path seldom traveled by wronged husbands."

When all the facts are taken into consideration in connection with the Sergeant's background, it cannot be said that his fear for his life had no foundation in reason, or even that his reasoning was defective, whether he thought that Johnny ought to shoot him, or that Johnny was going to shoot him, or both. A judge who was born and reared in West Texas and who, during the early years of his practice had experience both in prosecuting and in defending "unwritten law" cases, by relating that experience to conditions as they existed in the Sergeant's home country when he grew into young manhood, has no difficulty in understanding the Sergeant's feeling that he had to ride low in the saddle until Johnny accepted the situation "peaceful-like".

The finding that the evidence establishes as a fact that the insured had mental capacity to change the beneficiary, in itself, disposes of most of the plaintiff's contentions. The discussion of her claims will therefore consist of comments on only a few of them.

In addition to the Sergeant's fear of being killed and his act of making an unrelated person beneficiary, the matters most seriously urged by the plaintiff to support her claim were his suicide, his excessive drinking with its possible consequences on his retirement, his sometimes disheveled appearance, his loss of weight, his doubts about his future and his lack of decisiveness in making plans therefor.

While some of the Sergeant's conduct undoubtedly showed bad judgment, all of

228

it can be explained consistently with mental competency.

▪ The mere fact of suicide is not proof of mental unsoundness. Jones v. Traders & General Ins. Co., Tex.Com. App., 1943, 140 Tex. 599, 169 S.W.2d 160, opinion adopted by Supreme Court. The other facts established by credible evidence, considered in connection with the suicide, did not show mental incompetence.

The psychiatrist and Billie stressed that the Sergeant lacked decisiveness in making his plans and in carrying them out. Billie said that he vacillated in his feeling about retiring at the end of twenty years in the Service; that on some occasions he would look forward to it with pleasure, while on others he would have doubts and hesitation about it. For obvious reasons, that kind of statement, as a basis for mental unsoundness, would have little appeal to a federal judge. The psychiatrist based his conclusion of lack of decisiveness on the Sergeant's handling of his domestic problems involving Billie and Lucille. He placed emphasis on the fact that the Sergeant did not go ahead and get his divorce after filing suit for it. His testimony in that connection shows that one of the general weaknesses in opinion testimony of psychiatrists is that their analysis of some facts in specialized fields outside their own requires either an omniscience they do not possess or an investigation they do not make. The psychiatrist evidently did not realize that adultery on the part of the applicant was an absolute defense to a divorce action, and that the only chance the Sergeant had to get a divorce was to keep his case pending as long as possible to see if Billie would agree to abandon her contest. The Sergeant's lawyer was bound to have known those things. The Sergeant knew them, too. He wrote in his letter of March 8, 1961, "To tell the truth, I would not be able to get a divorce if I wanted to."

The psychiatrist pointed to the Sergeant's letters as evidence of his lack of decisiveness about his domestic problems. It was claimed that they showed that he could not make decisions and carry them out. With the problems the Sergeant had, and with his course so dependent upon the wills of others, such as Billie, Lucille and Johnny, he had to live only from day to day. His plan to marry Lucille was dependent upon two divorces, either one of which could be defeated easily by the wronged spouse. Lucille had to remain interested in him. He could not look too far ahead when he thought there was danger of Johnny's getting trigger happy. He was also desperately trying every method to get Billie to give him the part of his allotment due him under their agreement. There was no chance for him to find Peaceful Creek where he could leisurely muse and plan on grassy banks beside cool, clear water. He was not in position to be decisive and call the shots. While his letters contain no 10 lb. words, and the grammar and spelling in them is poor, even with their lack of decisiveness, they are just about what would be expected of a normal person of the Sergeant's stature and education when faced with an outlook as dark as the inside of a cow.

The plaintiff offered two expert witnesses on the issue of mental incapacity. One was the medical doctor who attended the Sergeant when he was in the Base Hospital for four days beginning January 18, 1961. The other was a psychiatrist who gave only hypothetical testimony.

▪ It has been consistently held that the trier of facts is not bound by the opinions of expert witnesses. Seaboard Surety Co. v. First Nat. Bank of Montgomery, 5 Cir., 1959, 263 F.2d 868; Mound Co. v. Texas Co., 5 Cir., 1962, 298 F.2d 905; Nass v. Nass, 1950, 149 Tex. 41, 228 S.W.2d 130; Luttes v. State, 1958, 159 Tex. 500, 324 S.W.2d 167. In the Luttes case, Judge Garwood said at page 189 of 324 S.W.2d:

"While, in a limited sense, all testimony may involve opinions of the witnesses, the proof here was peculiarly of the 'opinion' or 'expert' type, and the occasion has to be at

least highly exceptional when such testimony, even though not contradicted by an opposing expert, must be deemed true as a matter of law. In Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W.2d 345, 346, we said, 'That character of testimony is but evidentiary and is never binding upon the trier of facts,' which means at least that the mere qualification of a witness as an expert does not cut off the factfinder from exercising considerable judgment of his own about how far his opinions are to be relied on. * * * ''

In the discussion following the above quotation, Judge Garwood emphasized that the trier of the facts has the same advantage from seeing an expert witness and watching his demeanor while testifying that he does in observing any other witness for the purpose of passing on his credibility and the weight to be given his testimony.

Knight v. Edwards, 1954, 153 Tex. 170, 264 S.W.2d 692, 696, and McDonald v. United States, U. S. App. D.C., 1962, 312 F.2d 847, 850, 861, show some of the general shortcomings of forensic psychiatry which prevent it from coming within that "highly exceptional" type of expert opinions which Judge Garwood said in the quotation above is sometimes binding on the trier of facts.

The opinion evidence of each of the two expert witnesses has been carefully considered. While the testimony of each of such experts was not subject to all the defects listed below, one or more of the following defects was applicable to the testimony of each of those witnesses:

■ 1. The testimony of the expert witness, when construed as a whole, as it must be under the rule announced in Jones v. Traders & General Ins. Co., supra, to determine the basis for his opinion, shows that he used a test entirely different from that recognized by the courts in this kind of case. The psychiatrist gave little weight to the question of whether the insured knew and understood what he was doing when he chang-

ed the beneficiary. The effect of his testimony was that the Sergeant was so indecisive by nature that he was incapable of forming an intent to change the beneficiary and of then taking action to carry it out.

2. His opinion was at variance with the conclusion drawn by the Court from all the credible evidence.

3. His opinion was based in part upon evidence which the Court did not regard as credible.

4. He did not have the advantage of all the picture of the Sergeant and his conduct. This applies especially to the psychiatrist who never saw the Sergeant. The weakness of hypothetical testimony of that type is recognized in Green v. Dickson, Tex.Civ.App., 1948, 208 S.W.2d 119, 125, writ ref. n. r. e.

5. His opinion was based upon erroneous interpretations of material facts.

6. He admitted in substance that it was his opinion that the Sergeant knew and understood what he wanted to do and what he was doing when he made the change of beneficiary.

7. His answers were obscure.

■ Finally, in weighing the opinions of the experts, the Court took full advantage of his opportunity to observe them while they were testifying.

The comments above made in connection with the evaluation of the psychiatrist's testimony are not intended to be personal in any way, or to be reflections upon the respected profession of psychiatry as practiced clinically by its able and ethical specialists. The remarks are directed objectively and impersonally towards some of the general shortcomings in the forensic phase of the profession with the hope that constant repetition of the problem will bring about the removal of some of the obstacles that now prevent courts from getting the full benefit of the learning of psychiatrists in many cases. Testimony of this nature has come a long way from the hocus-pocus witnessed more than just occasionally in the courtroom by trial lawyers some years back; but some serious gen-

eral defects still appear in it. Several of the more serious ones appeared in the opinion evidence given in this case.

■ Great progress will be made towards utilization of testimony of psychiatrists when they recognize that, for a number of purposes, including consistency and uniformity, the courts must have a standard test for determining mental questions, and that the tests for clinical purposes and for litigation are in many types of cases necessarily different. McDonald v. U. S., supra, shows that the District of Columbia courts drifted around in the misty vagueness of forensic psychiatry for eight years without a test for mental "defect" or "disease", depending from case to case upon psychiatrists testifying as experts to furnish some kind of a guide. There was no dissent about the unsatisfactory results, although the following description of them is quoted from the dissenting opinion of Chief Judge Miller, in McDonald v. U. S., supra, 312 F.2d at p. 861:

> "The rulings to which I refer have become especially necessary because of the frequent alteration and expansion of the definition of 'mental disease' by those experts who appear most frequently as witnesses in this jurisdiction. They suddenly reclassified psychopathic (sociopathic) personality as a mental disease in In re Rosenfield, 157 F.Supp. 18 (D. D.C.1957); they reclassified emotionally unstable personality as a mental disease in Campbell v. United States, supra [113 U.S.App.D.C. 260, 307 F.2d 597]; they reclassified narcotics addiction as a mental disease in United States v. Carroll, Criminal No. 383–62 (D.D.C. June 28, 1962) and United States v. Horton, Criminal No. 59–62 (D.D.C. July 12, 1962). I think it obvious that the new classifications were made by the doctors for clinical purposes only, for demonstration is not needed to make it plain that these conditions newly called 'mental diseases' are not such in the legal sense. *Until now, this court has allowed the shifting wind of expert nomenclature to control its decisions."* (Emphasis ours).

The Court of Appeals for the District of Columbia sitting in the McDonald case was in unanimous agreement on the following:

> "Our eight-year experience under Durham suggests a *judicial* definition, however broad and general, of what is included in the terms 'disease' and 'defect.' * * *" (Majority opinion, 312 F.2d at p. 850).

In that connection, Chief Judge Miller said in his dissenting opinion, 312 F.2d at p. 861:

> " * * * But the court (referring to majority opinion) does take two important, much needed and long over-due steps: (a) it says, for the first time, what *we* mean by the term 'mental disease or defect' in connection with criminal responsibility; (b) it *rules* quite clearly that the jury is the sole and final judge of the credibility of all witnesses, including those who testify as experts, and that is to be so instructed. Heretofore, these two elements have been sadly lacking in this court's opinions."

■ If the testimony of the psychiatrist is to be of value, the opinion he gives in court must be arrived at by the use of the test approved by law, rather than by the one he uses for clinical purposes. A refusal to recognize that fact makes his trip to the courthouse practically worthless. Knight v. Edwards, supra. The majority opinion in McDonald v. U. S., supra, 312 F.2d at p. 850, says, "What psychiatrists may consider a 'mental disease or defect' for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purpose in determining criminal responsibility." The clinical "bad judgment" test so frequently used as a basis for psychiatrists' opinions in litigation is not acceptable to the courts. Knight v. Edwards, supra. Business would be paralyzed if it were.

The reasoning in the statements above quoted applies with equal force in civil and criminal cases.

The failure of the psychiatrist who testified in this case to observe the principles above discussed caused the Court to give his opinion less weight than it might otherwise have received.

For the reasons stated, it is concluded that the change of beneficiary in question is valid, and that Lucille Robertson is entitled to recover the proceeds of the policy under option (1) of Section 717 (b), 38 U.S.C.A., the payment plan designated by the insured.

A reasonable fee for the services of the attorney who has represented Lucille Robertson is $1,000.00, representing ten per cent. of the amount of the policy. It is to come out of the proceeds of the policy as and when they are paid to the defendant, Lucille Robertson.

Judgment will be entered in accordance with this opinion, which will serve as findings of fact and conclusions of law under Rule 52(b), F.R.Civ.P.