340

The Court will therefore treat it as a motion to dismiss a portion of the complaint for failure to state a claim upon which relief can be granted.

 In answer to defendants' motion, plaintiffs contend that all overcharges constitute one violation and are collectable if the action is brought within one year after the date of the last overcharge; plaintiffs further point out that under Rule 8(c) of the Federal Rules of Civil Procedure, 28 U.S.C., the defense of statute of limitations is designated as an affirmative defense, and therefore may be raised only by answer.

In Magnotta v. Leonard, supra, this Court rejected similar arguments and the Court finds no opinions to the contrary since the filing of that opinion. The Court, therefore, finds merit in the defendants' motion, and the motion to dismiss will be granted.

### HINE v. UNITED STATES.
### No. 50145.

United States Court of Claims.
July 13, 1953.

Hardy K. Maclay, Washington, D. C., for plaintiff. Edgar J. Melchione, Los Angeles, Cal., was on the brief.

M. P. Wolk, Washington, D. C., with whom was Asst. Atty. Gen. H. Brian Holland, for defendant. Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

The sole question involved in this suit is whether or not so-called Fishing Rod Kits as sold by plaintiff George Hine Products Co. are "fishing rods" within the meaning of Section 3406(a) of the Internal Revenue Code which provides in pertinent part as follows:

"There shall be imposed on the following articles, sold by the manufacturer * * * a tax equivalent to the

rate, on the price for which sold, set forth in the following paragraphs:

"(1) Sporting goods. * * * fishing rods, creels, reels, and artificial lures, baits, and flies; * * *." 26 U.S.C. 1946 Ed. Sec. 3406.

Plaintiff's business, started in 1946, consisted originally of the manufacture and sale of completed bamboo fishing rods, but during 1947 he discontinued the manufacture and sale of such rods and became the exclusive distributor of a spun glass fishing rod shaft manufactured by the Harrison-Rennels Company.

The shafts which are sometimes referred to as "blanks" were the essential part of a fishing rod and were sold primarily to hobbyist type of fisherman who preferred to complete the fishing rod in accordance with his own personal desires and/or superstitions. In order to bring the shafts to the state of completion which would warrant their description as completed fishing rods within the conception of laymen, or "catch as catch can" fishermen as distinguished from "hobbyist" fishermen, the purchaser was required to do the additional things described in Finding 4.[1]

Obviously, allowance was made for hobbyist fishermen to "rig" the shafts according to individual requirements. In other words, various kinds of ferrules with different bushings could be affixed and installed, and guides of different sizes and materials in varying numbers could be affixed along the shaft. Spun glass shafts were an innovation on the market at the time plaintiff became exclusive distributor for the Harrison-Rennels Company. Indeed, they were novel when compared with one-piece bamboo and steel rods as well as sectional or disjointed rods commonly known to ordinary fishermen up to that time.

It is admitted that for practical purposes, plaintiff was the only company selling spun glass rods along with ferrules which could be properly attached because of the novelty of this type of rod upon the market at that time, 1947 to July 1948. (Finding 5.)

Because of the novel nature of the rod and the difficulty of obtaining ferrules of proper size by the purchasers of such rods as well as the difficulty of attaching ferrules to the shafts, plaintiff in 1948 began selling "kits" containing all the items needed to make up a complete fishing rod except wrapping material, varnish and color retainer. The "Kit" contained: (a) spun glass shaft with ferrule attached, (b) reel seat and handle assembly, (c) matched set of guides and tip-top, affixed to a card but not installed on the shaft, (d) on some rods, cork foregrips cemented to the shaft. (Finding 6.)

Plaintiff did not manufacture any of the component parts of the kit, except the ferrules which were reamed on a screw machine from purchased forms. In addition to this minor manufacturing operation, plaintiff also performed at his factory all work requiring special tools and cement including the installation of ferrules, adaptors, foregrips, reel seats, and winding checks. By wrapping on the guides and cementing on the tip-top, the purchaser could make a completed fishing rod.

From July to September 1948, inclusive, the plaintiff continued the manufacture and sale of these kits and collected excise taxes from his vendors on the sale of such kits which he paid to the Collector of Internal

---

1. 4. In order to make the shafts or blanks into completed fishing rods, purchasers were required to do the following:

"(a) Furnish and install a metal cap known as a ferrule. In the installation of the ferrule, a fiber bushing, known as an adaptor, is glued in the ferrule. The ferrule with adaptor is then glued to the butt end of the shaft.

"(b) Furnish and attach guides along the shaft through which to run the fishing line. The guides are affixed to the shaft with colored thread or wire by a process known as wrapping. Color retainer and varnish are then applied to the wrapping.

"(c) Furnish and install on the tip end of the shaft another guide known as a tip-top. These are affixed with a special cement.

"(d) Furnish a reel seat and handle assembly.

"(e) On some types of rods, furnish and glue cork foregrips to the shaft."

Revenue. Hence those taxes are not in issue in this suit.

On July 26, 1948, the Commissioner of Internal Revenue advised plaintiff that the sale of the kit above described would be taxable under Section 3406(a) (1) of the Internal Revenue Code, *supra,* inasmuch as the applicable regulations provided that a manufacturer who sold a taxable article in a knockdown condition but complete as to all component parts was liable for the tax. (The letter of inquiry dated June 28, 1948, and the Commissioner's response dated July 26, 1948, are set out in Finding 8.)

In response to plaintiff's further inquiry dated July 28, 1948, the Commissioner advised him on August 20, 1948, that the kit would be taxable even if the tip-top were excluded. (See Finding 9.)

Plaintiff and his attorney concluded that, if certain components of a completed fishing rod were omitted from the kit, the kit would not be taxable when sold. In November 1948, plaintiff began and has since continued to make and sell the kit, the taxability of which is here in issue, differing from the one sold during the months of July, August, and September only in that the guides and tip-top were omitted.

In referring to the kits in the catalog of plaintiff's products, these words are used:

> "Kits—All work requiring special tools and cement has been done at the factory, such as installing ferrules, cork grips, reel seats, and winding checks. Customer has only to wrap the guides and install the tip-top to build a rod to meet his own requirements."

Since November 1948, plaintiff did not collect from his vendors or pay to the Collector the manufacturer's excise tax imposed by Section 3406(a) (1), *supra,* upon the kits sold. The Commissioner of Internal Revenue determined that the kits were "fishing rods" within the meaning of that Section, and assessments were made on the sales thereof for the period from November 1, 1948, through February 28, 1950, in the amount of $9,784.67. On January 17, 1951, plaintiff paid $517.32 of the amount so assessed representing the tax for the month of November 1948, and on the same day filed a claim for refund of that amount. This claim was rejected by the Commissioner on March 16, 1951.

In our findings of fact numbered 14 through 23, a detailed description of plaintiff's business methods in marketing fishing rod kits as well as the component parts of a fishing rod, including shafts, ferrules, bushings, reel seat, handle assemblies and cork foregrips, can be found along with a discussion of the uses made of the various products by hobbyists as well as ordinary type of fishermen. These matters should be of interest to those who love and participate in the great sport of fishing, but for the purposes of this opinion we do not deem it necessary to set them out here. Suffice it to say, we must decide whether the kit, as marketed and sold by plaintiff during November 1948, constituted "fishing rods" within the meaning of the Internal Revenue Code.

Neither the statute nor the Regulations defines exactly what is meant by "fishing rods." Plaintiff, in order to assist the court in determining whether his product is one which should be subject to the excise tax proposes three tests: (1) The kit as sold by plaintiff cannot be used as a fishing rod because of absence of the guides and tip-top; (2) Without the guides and tip-top the rods are not substantially complete; and (3) Business reasons other than tax considerations dictated plaintiff's policy of offering kits for sale rather than completed rods. Plaintiff argues that, while no one of these tests is determinative, when considered together they do establish that the kit is not a fishing rod.

We have carefully considered these three tests in the light of plaintiff's resourceful arguments and our own experience as fishermen who have at one time or another employed almost every device for catching fish known to man from the bent pin on a piece of string attached to a hand-cut willow branch to the finest sectional and/or one-piece rods made of bamboo, steel or spun glass to which have been attached ferrules, tip-tops, guides, handles, reel seats and reels of varying shapes, sizes and quality, carrying lines of every kind available.

However, we cannot agree with plaintiff principally for the reason that we feel this product falls within the commonly understood and accepted meaning of the term "fishing rod." This court has consistently held that words of a statute should be presumed to be used in their ordinary and usual sense within the meaning commonly attributed to them, unless the contrary clearly appears. Coleman v. United States, 93 Ct.Cl. 127, 131–132, 37 F.Supp. 273. In spite of the fact that plaintiff's product did not include tip-tops and guides, the great majority of people everywhere would know and call them "fishing rods." True enough, they might be called "blanks" by those engaged in the trade, but what could they be called or to what practical use could they be put other than "fishing rods?" Plaintiff says that it would be extremely difficult if not impossible to cast with a "blank" rod and this is true, but we can conceive of no other practical use for them except as fishing rods.

In Samuel Winslow Skate Mfg. Co. v. U. S., 50 F.2d 299, 72 Ct.Cl. 323, certiorari denied Endicott v. United States, 285 U.S. 555, 52 S.Ct. 456, 76 L.Ed. 944, this court considered the question of whether various types of skates adapted for use by children were "skates" within the meaning of an earlier revenue law imposing an excise tax on sporting goods. We held the articles taxable saying, 50 F.2d at page 302, 72 Ct. Cl. at page 331:

"We think the different types of skates made and sold by the plaintiff were in all respects skates, and that the variation in design and structure was no more than a purpose to cater to the wants of those desiring to use skates, either roller, ice, sled, or sidewalk, a commercial intent to supply the trade with a type of skate adapted to the particular use and status of the prospective customers, a mere variation in style and structure of an existing and long-identified article of amusement and exercise well known and easily recognizable as 'skates.'"

Recently, in Union Pacific Railroad Company v. United States, we were called upon to decide whether a steel bomb body filled with an incendiary gel, but without a burster and fuze attached could be properly described as an "incendiary bomb" within the meaning of certain consolidated freight classifications. In holding that it could be so described, we said:

"While the absence of the burster and fuze admittedly renders the shipment of the article less hazardous from a transportation standpoint, the only logical description of such an article is as an incendiary bomb. The articles as described on the bills of lading were incendiary bombs without bursters and fuzes, and they had no purpose or use except as incendiary bombs.[2]"

While there were various styles and sizes of the blank rods sold by plaintiff with interchangeable reel seat and handle assemblies within the same general class of rods, they nevertheless continued to retain an identity which cannot be otherwise described than as "fishing rods." Having reached the stage of manufacture or development where they became recognizable as one of the sporting goods described in Section 3406(a) (1) the rods upon being sold were subject to tax even though there remained one or more finishing operations to be performed.

Plaintiff makes a further argument to the effect that the person who actually finishes the rods may also be regarded as the manufacturer of a taxable article and that it would be necessary to go to the streams, lakes, and oceans, in order to collect the taxes due and owing to the Government. While it is true that the arm of the Tax Collector reaches a long way in every direction, in this instance provision has been made not only to collect the proper tax but also to prevent the possible imposition of double taxes where an article is sold "for use by the vendee as material in the manufacture or production of, or as a component part of, an article enumerated in this chapter * * *." Section 3442, Internal Rev-

2. 111 F.Supp. 266, 268.

enue Code, 26 U.S.C., 1946 Ed., § 3442. Section 316.21 of Treasury Regulations 46 (1940 Ed.) provides that the sale, in such cases, is not subject to tax providing the vendee furnishes the seller with an exemption certificate. So, while it is true that the purchaser of one of plaintiff's kits who in most instances is the fisherman himself may be regarded as a manufacturer of a taxable article when he installs the tip-tops and guides according to his own liking, the plaintiff is not relieved from liability under the statute unless he obtains exemption certificates from his vendees.

The parties have stipulated that no tax has been collected from the plaintiff where the vendee has supplied exemption certificates. Hence plaintiff's liability is for the tax on sales made to persons who did not furnish exemption certificates even though such persons might also be liable for excise taxes on their use or sale of kits which were made into completed fishing rods.

Plaintiff evidently tried to market as much of a fishing rod as possible without becoming liable for excise taxes. We think that plaintiff's policy of offering kits for sale rather than completed rods was dictated more by tax considerations than by business or commercial reasons.

Plaintiff's petition is hereby dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.