**TANDY LEATHER COMPANY et al.**

v.

**UNITED STATES of America.**

Civ. No. 4617.

United States District Court
N. D. Texas,
Fort Worth Division.

April 14, 1964.

Benjamin L. Bird, Weeks, Bird, Cannon & Appleman, Fort Worth, Tex., for plaintiff.

John Bailey, Tax Division, Justice Department, Dallas, Tex., for Government.

BREWSTER, District Judge.

Plaintiffs, Tandy Leather Company, Tandy Leather Company of Texas, Tandy Leather Company of Amarillo, Tandy Leather Company of Houston, Tandy Leather Company of Corpus Christi, Tandy Leather Company of Dallas, and Tandy Leather Company of San Antonio, each a Texas Corporation, bring this action against the defendant for the recovery of certain amounts of luggage excise taxes, interest and penalties assessed and collected for the first two quarters of 1961 under the authority of Section 4031, Internal Revenue Code of 1954, as amended, 26 U.S.C.A. § 4031.

The Court has jurisdiction under 28 U.S.C.A. § 1346(a).

The amount originally sued for contained a small sum of jewelry excise taxes arising from the sale at retail during such times of Cuff Link Kits, Bracelet Blanks-Slims, Bracelet Blanks-Congo, Earring Kits, Gaucho Tie Sets, Galaxy Coin Purses, Shields, Squares, Circles, Oval Discs, Tie Clip Kits, Mardi Gras Bracelet Kits, Mardi Gras Earring Kits, and Mardi Gras Cuff Link Kits. The plaintiffs abandoned that portion of their

claim. When effect is given to such concession, the amounts of IRC Section 4031 luggage excise taxes, interest and penalties involved are:

| PLAINTIFF | PERIOD | | TAX | INTEREST | PENALTY | TOTAL |
|---|---|---|---|---|---|---|
| Tandy Leather Company | 1Q | 1961 | $577.57 | | | |
| | 2Q | 1961 | 470.78 | $19.15 | | $1,067.50 |
| Tandy Leather Company | 1Q | 1961 | 144.77 | | $ 36.19 | |
| of Texas | 2Q | 1961 | 164.35 | 5.26 | | 350.57 |
| Tandy Leather Company | 1Q | 1961 | 244.29 | | 61.07 | |
| of Amarillo | 2Q | 1961 | 165.72 | 7.77 | | 478.85 |
| Tandy Leather Company | 1Q | 1961 | 528.38 | | 132.10 | |
| of Houston | 2Q | 1961 | 428.04 | 17.49 | | 1,106.01 |
| Tandy Leather Company | 1Q | 1961 | 279.22 | | 69.81 | |
| of Dallas | 2Q | 1961 | 247.66 | 9.46 | | 606.15 |
| Tandy Leather Company | 1Q | 1961 | 112.77 | | 28.19 | |
| of Corpus Christi | 2Q | 1961 | 73.05 | 3.55 | | 217.56 |
| Tandy Leather Company | 1Q | 1961 | 181.55 | | 45.39 | |
| of San Antonio | 2Q | 1961 | 163.15 | 6.17 | | 396.26 |

The principal offices of the above named plaintiffs are in Fort Worth, Tarrant County, Texas. Certain other corporations chartered outside Texas were originally included among the plaintiffs; but they were dismissed upon the agreement set out in the pre-trial order that the judgment in this case will be binding upon them and upon the defendant.

Generally stated, this case involves the questions of whether kits of precut leather and other component parts sold by the plaintiffs constituted mere unassembled parts of taxable articles in a knockdown condition, and of whether the failure of all the plaintiffs except Tandy Leather Company, Retail Division, a Texas Corporation, to file timely excise tax returns for the first quarter of 1961 was due to reasonable cause and not to willful neglect, under Section 6651 of the 1954 Code. In regard to the latter question, the taxpayers say that they acted in good faith upon the advice of counsel.

The first question stated is the troublesome one. The taxpayers contend that the transactions involved were not sales of taxable articles in mere knockdown condition because: (1) the assembly operations required were so substantial as to preclude the kits of unassembled parts from being considered as articles subject to the luggage excise tax; and (2) the fact that one or more parts necessary for the completion of the designated article were omitted from some of the kits prevented those kits from being considered as such taxable articles.

The defendant argues that: (1) the sale of the taxable articles in a mere unassembled or knockdown condition, with all or substantially all of the major components included, did not avoid the excise tax; and (2) acceptance of the taxpayers' theory here would open the door to wholesale avoidance of the statute.

With the exception of Tandy Leather Company, a Texas Corporation, the plaintiffs herein did not file luggage excise tax returns for the first two quarters of 1961. The Internal Revenue Service, on defendant's behalf, determined that the assortments and kits here involved were purses, billfolds, bags, etc., as mentioned in IRC Section 4031, and that upon the retail sale thereof, such assortments and kits were subject to the excise tax laid by such

section. The Internal Revenue Service also determined, with respect to all plaintiffs other than Tandy Leather Company, that for the first quarter of 1961 penalties of 5% of the amount of the tax were due under IRC Section 6651 because of their failure to file excise tax returns with respect to such sales within the time required by law. Pursuant to the aforesaid determinations, defendant assessed, and on November 3, 1961, plaintiffs paid to the District Director of Internal Revenue, Dallas, Texas, the amounts of tax, interest and penalties hereinabove set out, plus the jewelry excise taxes. On December 12, 1961, plaintiffs filed with such District Director claims on Form 843 for the refunding of the hereinabove specified taxes, interest and penalties, and thereafter, by statutory notices of disallowance, dated May 4 and May 9, 1961, the Commissioner of Internal Revenue disallowed and rejected such claims. This action was then timely filed.

None of the aforesaid excise taxes, interest or penalties was included in the prices of the assortments or kits sold by plaintiffs during the first two quarters of 1961. Plaintiffs intend to bear all such matters regardless of the outcome of this litigation.

The question of whether the failure to file timely excise tax returns was due to reasonable cause, rather than to willful neglect, poses no real problem. The taxpayers acted in good faith in reliance upon the advice of a highly reputable, competent lawyer who had specialized in the practice of tax law for many years. Other justifying circumstances could be given, but that fact alone is sufficient to constitute reasonable cause and to prevent the taxpayers from being penalized for willful neglect. Mayflower Investment Company v. Commissioner of Internal Revenue, 5 Cir., 1956, 239 F.2d 624.

In regard to the other question, the Court is of the opinion that the taxpayers did not discharge their burden of proving by a preponderance of the evidence that the articles here in question were of such character that they were not subject to the excise tax. The general rule in actions for the recovery of taxes assessed and collected that the findings of the Commissioner are presumably correct applies to suits for recovery of excise taxes; and the burden was therefore on the taxpayer here to prove his case by a preponderance of the evidence. Technicolor Motion Picture Corp. v. Westover, D.C.Cal., 1951, 102 F.Supp. 541, affirmed, 9 Cir., 202 F.2d 224.

Section 4031, Internal Revenue Code of 1954, as amended, effective January 1, 1959, provides:

"There is hereby imposed upon the following articles, by whatever name called, sold at retail (including in each case fittings or accessories therefor sold on or in connection with the sale thereof) a tax equivalent to 10 percent of the price for which so sold—

Bathing suit bags.
Beach bags or kits.
Billfolds.
Briefcases.
Brief bags.
Camping bags.
Card and pass cases.
Collar cases.
Cosmetic bags and kits.
Dressing cases.
Dufflebags.
Furlough bags.
Garment bags designed for use by travelers.
Hat boxes designed for use by travelers.
Haversacks.
Key cases or containers.
Knapsacks.
Knitting or shopping bags (suitable for use as purses or handbags).
Makeup boxes.
Manicure set cases.
Memorandum pad cases (suitable for use as card or pass cases, billfolds, purses, or wallets).
Musette bags.
Overnight bags.
Pocketbooks.
Purses and handbags.

Ring binders, capable of closure on all sides.

Salesmen's sample or display cases, bags, or trunks.

Satchels.

Shoe and slipper bags.

Suitcases.

Tie cases.

Toilet kits and cases.

Traveling bags.

Trunks.

Vanity bags or cases.

Valises.

Wallets.

Wardrobe cases."

Sec. 48.4031–1 (TD 6514, filed 12/9/60) says:

"(a) In general. Section 4031 imposed a tax on:

(1) The following articles, by whatever name called, sold at retail—

Bathing suit bags.

Beach bags or kits.

Billfolds.

Briefcases.

Brief bags.

Camping bags.

Card and pass cases.

Collar cases.

Cosmetic bags and kits.

Dressing cases.

Dufflebags.

Furlough bags.

Garment bags designed for use by travelers.

Hatboxes designed for use by travelers.

Haversacks.

Key cases or containers.

Knapsacks.

Knitting or shopping bags (suitable for use as purses or handbags).

Makeup boxes.

Manicure set cases.

Memorandum pad cases (suitable for use as card or pass cases, billfolds, purses, or wallets).

Musette bags.

Overnight bags.

Pocketbooks.

Purses and handbags.

Ring binders, capable of closure on all sides.

Salesmen's sample or display cases, bags, or trunks.

Satchels.

Shoe and slipper bags.

Suit cases.

Tie cases.

Toilet kits and cases.

Traveling bags.

Trunks.

Vanity bags or cases.

Valises.

Wallets.

Wardrobe cases."

"(2) Fittings or accessories for any article enumerated in subparagraph (1) of this paragraph sold on or in connection with the sale at retail of such article.

"(b) Meaning of terms—(1) In general. For purposes of the tax imposed by section 4031, the articles listed in such section include all receptacles commonly or commercially known and sold as such regardless of design, size, or materials from which made or the purpose for which they are to be used. If there is doubt as to whether an article is taxable, the manner in which the article is advertised or otherwise held out for sale shall be considered. The articles listed in section 4031 include any such articles regardless of the name attached to, or associated with, the articles for merchandising or other reasons. For example, an article marketed as a 'money holder' is taxable if in fact it is a 'billfold' or 'wallet.'

"(2) Briefcases. The term 'briefcases' includes, for purposes of the tax imposed by section 4031, articles commonly or commercially known and sold as such regardless of materials from which made or the purpose for which they are to be used. The term also includes so-called 'portfolios,' 'envelopes,' etc., capable of being closed on all four sides which are designed and constructed for carrying or conveying unfolded legal-size or letter-size papers, documents, etc. The term does not in-

clude 'portfolios,' 'envelopes,' etc., designed and constructed primarily for storage purposes.

"(3) Knitting or shopping bags. A knitting or shopping bag shall be considered suitable for use as a purse or handbag, for purposes of the tax imposed by section 4031, if it is capable of being carried in the hand, or hung on the arm or across the shoulder, and if—

(i) The bag has a secure closure, or

(ii) The bag has a built-in purse, side pocket, or compartment closed by a zipper, snap fastener, or other secure closure,

provided the bag, or the built-in purse, side pocket, or compartment, is capable, when open, of holding the normal contents of a purse or handbag.

"(c) Children's luggage and toy luggage. The tax applies to the sale at retail of articles listed in section 4031 which are designed and constructed for use as such by a child (for example a child's purse, handbag, or suitcase). However, the tax does not attach to the sale at retail of articles which simulate articles of the type referred to in section 4031 but which are toys, that is, articles designed, constructed, and advertised or otherwise held out for sale for the amusement of a child or for use in a child's play. For example, the tax shall not apply to the sale at retail of a trunk designed, constructed, and held out for sale solely to hold clothing for a doll.

"(d) Rate of tax. The tax is imposed at the rate of 10 percent of the price for which the taxable article is sold at retail. For definition of the term 'price,' see section 4051 and the regulations thereunder contained in Subpart G.

"(e) Liability for tax. The tax is payable by the person who sells at retail any article subject to tax under section 4031. For tax applicable to leases, see section 4052 and the regulations thereunder contained in Subpart G.

"(f) Sales by United States. For provisions relating to sales at retail made by the United States, its agencies or instrumentalities, see section 4054 and the regulations thereunder contained in Subpart G.

"(g) Tax-free sales. For provisions relating to tax-free sales of articles referred to in section 4031, see—

(1) Section 4055, relating to the exemption of sales for the exclusive use of any State or political subdivision thereof, or the District of Columbia,

(2) Section 4056, relating to the exemption of sales for export, and

(3) Section 4057, relating to the exemption of sales to nonprofit educational organizations,

and the regulations thereunder contained in Subpart G of this part. (Reg. #48.4031–1)."

Plaintiffs were engaged during the first two quarters of 1961, and are now engaged, in the sale at retail of leather, leathercraft and similar merchandise, including assortments of various items, such as precut leather, loose zippers, belting, fasteners, catches, and other constituent parts, and, usually, printed instructions concerning the construction, assembly, tooling and stamping of the items involved in this case. Those assortments were usually sold in a bag, sack or cardboard box, and they were referred to and sold as purse kits, handbag kits, billfold kits, key cases, co-ed bags, etc. The items in an assortment or kit, with the application of varying amounts of labor, intelligence and skill, and the use of other parts or supplies (usually not contained in the sack or bag or box, but sold separately) such as thongs, lacings, threads, cement, bleaches, coatings, could be made into complete purses, handbags, billfolds, etc. None of the assortments involved in this proceeding could actually be used at the time of sale as a purse or

handbag or other item mentioned in IRC Section 4031 without assembly of the parts. The various items and parts mentioned in the aforesaid kits, sacks, bags or boxes were specifically designed and precut to be made into certain named articles such as handbags, wallets, etc., identified in plaintiffs' catalogues and written instructions. There is no question between the parties about the fact that each of the articles here involved, when assembled, came within the purview of the above statute and regulation.

Sixty-eight of the kits are involved in this case. It would unduly lengthen this opinion to give a detailed description of each one of them with the component parts and the tools and materials needed to make the assembly. Samples of each of the kits are in evidence. Adequate descriptions of each one of them and their component parts, together with pictures of the designated completed articles, appear in the plaintiffs' catalogues received in evidence. Catalogue No. 87 covers the period involved in this suit, and the exhibit number of each sample kit is also written at the side of the catalogue picture of that type of kit. The catalogue and the written instructions in the kits themselves show the character and amount of work required to assemble the various articles. Only the facts showing the general principles relating to the kits and articles will therefore be reviewed here.

Since July, 1961, plaintiffs have discontinued selling the assortments described in Exhibit 4 attached to the pre-trial order.

Persons, concerns and institutions to whom and to which plaintiffs sold such assortments and kits during the first two quarters of 1961 are classified in Exhibit 3 attached to the pre-trial order. That exhibit also shows the approximate percentages of the sales of all of such assortments and kits to the various classes of purchasers.

The major manufacturing and construction operations had already been completed by the plaintiffs at the time the kits were sold. The leather had been tanned and processed from its raw material state into its usable state; and it had been precut with precision into parts especially designed for assembly into a designated completed article. Those parts merely had to be put together to complete the particular product. The preparation and cutting of the leather was a relatively arduous process, much more difficult than the comparatively minor assembly operations remaining to be performed by purchasers of the kits. The skilled and professional leather craftsmen usually bought the tanned hides in preference to the kits of precut parts, and did their own cutting.

The parts in each kit were pre-designed and precut so that essentially all that remained to be done was to put the parts together, as distinguished from the use of any creativeness to make something other than the precision cut, knocked down article. Some of the kits were complete; but generally they contained everything necessary except the leather lacing or the glue for binding the edges of the leather together. The lacing was usually omitted because the preference for color and type of lacing varied with the customers. About half the kits had holes already punched in the leather for lacing, but some of the kits required that the holes be punched by the purchaser. Where cementing or gluing together of the parts was required, the edges sometimes had to be skived, or bevelled by trimming, by the customer before cementing. On occasions, the precut leather parts required a treatment known as "finishing", which was a simple process of applying a liquid to the leather in the same manner as daubing a liquid polish on shoes. There was nothing complicated about any of the work required of the customer, and the plaintiffs' catalogues said that it was so easy that it could be done by children or by beginners. As a matter of fact, much of plaintiffs' advertising of these kits was aimed at beginners, children and handicapped persons, with emphasis on the ease and simplicity of the work and on the remote

likelihood of failure when the plain and uncomplicated written instructions in the kit were followed.

Decoration of the leather was done with carving and stamping tools. It was the only part of the work in connection with the kits which could become complicated, as it offered an opportunity for the customer to use his imagination and to express his artistic skill. The Court considers that the amount of time, work and skill required for that process is immaterial because decoration was not essential to the completed assembly of the taxable article; but it will be pointed out that decoration was not necessarily difficult. Page 1 of plaintiffs' Catalogue No. 87 says in connection with the billfold carving set admitted in evidence as Exhibit 5, and offered by plaintiffs for sale at $2.95: "New Handy-Carve wonder tool. One easy tool that makes beautiful leather work as easy as writing your name", and that, "Even small children start carving and tooling beautiful leather billfolds right away with the handy carve tool."

In almost all instances, tools were sold separately from the kits. Usually, a lacing needle or a skiving knife was the only tool needed for the more simple articles. Generally, most of the extra tools were purchased for the decoration process. Page 1 of Catalogue 87 shows that a complete set of starter·tools cost less than $10.00. They could be purchased in combination with a number of other leathercraft articles for $12.95, and were "made to last a lifetime." All tools, as well as the necessary parts and materials omitted from the kits, were offered for sale by plaintiffs in the same places as the kits.

The plaintiffs attempted to discharge their burden of showing that the items in question were not taxable articles in a mere knockdown or unassembled condition primarily with the testimony of two witnesses who occupied managerial positions with the plaintiffs. It is not necessary to separate their testimony, as the plaintiffs' case depends on the combined effect of it. The total import of that testimony was that the kits involved were not purses, billfolds, bags, etc., and that the assembly operations required such considerable time, work and skill that they were actually a substantial and significant part of the process compared to the manufacture and preparation of the component parts. They went into detailed estimates as to the time, labor and skill required respectively of beginners, semi-skilled persons and experts for assembly of each article. They said that the leather parts in the kits were usable and used for slingshots and for repair of footballs and saddles. It was incredible to the Court that a person would buy a whole kit and pay for the labor and skill involved in the precision precutting of the leather for some other purpose, when he could buy a simple piece of leather suitable for patching a football or a saddle for much less money without any kit, or could follow the time honored, economical habit of taking the tongue out of some old, discarded shoe for the leather needed in a slingshot or beanshooter. No practical use of the kits in question could be made other than for the assembly of the particular articles for which they were advertised and the parts were specially cut and designed. The Court does not accept their testimony as reliable upon any crucial matters, including those mentioned in this paragraph, unless this opinion expressly shows otherwise. Much of their testimony was in the nature of opinion evidence that was not satisfactory. That type of evidence is not binding upon the trier of facts. Seaboard Surety Co. v. First National Bank of Montgomery, 5 Cir., 1959, 263 F.2d 868; Morris v. United States, D.C.Tex., 1963, 217 F.Supp. 220. Their bias was apparent from their demeanor, and it colored their testimony. In fairness to these witnesses, it should be said that there was nothing to indicate any turpitude on the part of either one of them. It is often the case, however, that the most unreliable testimony comes from an honest witness whose interest in the litigation is so strong that he does not realize that he is being influenced by it. In the last

place, their testimony on very important matters was contradicted by the plaintiffs' own written kit instructions and its widely circulated advertising. The following quotations in connection with the various kits from plaintiffs' Catalogue No. 87 distributed to its customers, actual and potential, throughout its entire trade area are illustrations of the contradictions:

*All kits generally:*

"7 REASONS Why You'll Enjoy Leathercraft"

"3. *Easy To Learn:* Streamlined, easy to follow instructions guarantee successful completion of your first projects." (Page 1).

*Key cases* (P. Exhibits 6–12):

"LOW COST. EASY TO MAKE FOR POCKET, PURSE OR PROFIT" (Page 8).

*Bag kits for little girls* (P. Exhibits 13–16):

"BAG KITS FOR LITTLE GIRLS —EASY TO MAKE"
and
"LOW COST—EASY TO MAKE GROUP PROJECTS" (Page 9).

It is stated separately in connection with advertising of P. Exhibits 18 and 20, that they are "Easy to Make." (Page 10). P. Exhibits 19, 21 and 22, also coin purses or small purses, appear on the same page, and there is nothing to indicate otherwise as to them.

P. Exhibits 23, 24, 25 and 26, coin purses and purse kits, are advertised and described on page 11. P. Exhibit 26 appears to be considerably larger than the others, and to require more time and work. It is advertised as: "SO EASY TO MAKE".

P. Exhibits 27, 28, 29 and 30 are advertised on pages 16 and 17 as being the "Most Wanted Top Quality Leather Kits for Business Men & Scholars." They include an executive portfolio, a zipper notebook, a notebook, a brief case, and a pocket memo pad. They appear from the evidence to be as complicated as any

of the articles involved. The words "EASY TO MAKE" appear in capital letters twice in connection with these articles.

*Billfolds for pictures and identification cards* (P. Exhibits 31 and 32):

"BEAUTIFUL LEATHER KITS FOR THE HOME. INDIVIDUAL. EASY TO MAKE FOR FUN AND PROFIT." (Pages 18–19).

*Billfolds* (P. Exhibits 33–39):

"Ideal Beginner project" (Page 20).

"All Parts pre-cut, lacing holes punched, Easy instructions included.

"You just personalize and assemble." (Page 20).

"WHY YOU'LL LIKE TANDY BILLFOLD KITS! *Kits complete* except for lace. You buy the lace separately and select your own color and style of lacing stitch. (please see pages 5, 22). Parts are precision cut, ready to assemble. Usually, lacing holes have been punched to save you time, allow you to concentrate on carving and finishing." (Page 21).

*Wallets* (P. Exhibits 40–43):

"EASY TO MAKE FOR YEAR 'ROUND GIFTS" (Page 22). *Women's handbags* (P. Exhibits 44–51):

"NEW. ALL NEW. HANDBAGS Easy to Make for Casual or Sophisticated Dress." (Pages 36–39).

"6 *Different Finishing Techniques:* Every Kit Contains . . . Special instructions to show you how to color leather, even texture leather to match any ensemble. SO EASY TO DO." (Page 36).

"Finest 6–8 oz. Live Oak cowhide cut with precision dies to guarantee accurate, perfect assembly. Fully illustrated modern step by step instructions. Clear easy to follow instructions to guarantee success. Each a complete lesson." (Page 36).

*Casual bag kits* (P. Exhibits 52–63):

"Easy beginner projects. Pre-cut from 6–8 oz. Live Oak Cowhide. Ready to be carved, dyed or finished just as they are. Each kit complete with leather lining and gusset. Gussets have zipper already stitched in. Easy carve pattern and instructions included." (Page 39).

*Bag kits for all occasions* (P. Exhibits 65–72):

"EASY TO MAKE BAG KITS FOR ALL OCCASIONS." (Page 40).

"Each kit complete—Ready to Assemble in traditional Western Style (illus) or Saddle Stitch and Dye for new Continental Look." (Page 40).

" * * * Kit includes handsome tooling pattern and complete instructions. Easy to make, as simple to lace as a billfold * * * " (Page 41).

The above statements do not include all the assertions about how simple and easy the customer would find the assembly of the articles for which the kits were designed, but they are enough to show that the emphasis was on "Easy" throughout. The words "Easy to Make", were usually in capital letters, and many of the statements above quoted were in large letters across the tops or the bottoms of pages, or in instances double pages, containing advertising of a number of the kits, The advertising was designed to appeal to children and beginners as well as to the customer who had done work with the kits before.

The plaintiffs seek to avoid the effect of now taking a position in conflict with their widely circulated advertising by saying that it was only sales talk. The Court does not so regard it, and accepts it in preference to the testimony of the plaintiffs' witnesses as stating the true facts with reference to the ease, simplicity, skill and effort required to assemble the articles for which the kits were specially designed. Without the support of their testimony in connection with the matters above discussed, the plaintiffs failed to meet their burden of proving their case by a preponderance of the evidence.

The Court is in accord with Revenue Ruling 61–204, 1961–2 Cum. Bull. 161, issued to the taxpayers here. The excise tax on the articles involved could not be avoided by selling them broken down into their major parts to be later assembled by the purchaser, or by selling separately related items or minor components such as lacing, fasteners, finishers, etc. Section 4031, Internal Revenue Code of 1954, as amended; Treasury Excise Regulations, Section 48.2181–(a) (2); Hine v. United States, 1953, 113 F.Supp. 340, 125 Ct. Cl. 836 (fishing rods). The Commissioner has consistently followed that principle. Rev.Rul. 167, 1943–2 Cum. Bull. 428, and Rev.Rul. 56–307, 1956–2 Cum.Bull. 808 (radios); Rev.Rul. 57–496, 1957–2 Cum.Bull. 726 (lawn mowers); Rev.Rul. 55–125, 1955–1 Cum.Bull. 518 (jewelry); Rev.Rul. 61–189, 1961–2 Cum.Bull. 185 (artificial flies); Rev. Rul. 58–365, 1958–2 Cum.Bull. 809, and Rev.Rul. 58–376, 1958–2 Cum.Bull. 810 (ball point pens). It is recognized that Revenue Rulings are neither binding nor controlling as precedents; but they are here cited to show the consistent construction that has been given to the question of sale of taxable articles in unassembled condition. The Court considers that they are legally sound.

The Court concludes that the plaintiffs are entitled to recover only the 5% penalties paid by them under the assessment with legal interest thereon, and that otherwise the judgment should be for the defendant.

This opinion will serve as findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.