**Wilson SIMMONS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 18826.**

United States Court of Appeals Fifth Circuit.

Oct. 17, 1962.

Jones, Circuit Judge, dissented.

Thomas R. Ward, Roland J. Mestayer, Jr., Meridian, Miss., for appellant.

Abbott M. Sellers, Acting Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Carolyn R. Just, Morton K. Rothschild, Attys., Dept. of Justice, Washington, D. C., Thomas R. Ethridge, U. S. Atty., Oxford, Miss., Hosea M. Ray, U. S. Atty., for appellee.

Before CAMERON and JONES, Circuit Judges, and DeVANE, District Judge.

CAMERON, Circuit Judge.

This is a suit by appellant, hereinafter referred to as plaintiff, to recover Federal manufacturer's excise taxes imposed upon him by the Internal Revenue Service for the year 1950 in the amount of $439.32 [1] plus interest. Jurisdiction is invoked under the provisions of 28 U.S.C. § 1291.

Plaintiff is a resident of West Point, Clay County, Mississippi; is now and was during the year 1950 engaged in business under the registered trade name of B & M Company as a dealer in bamboo cane fishing poles. Plaintiff began this business in 1946 and has continued in it ever since. The bamboo poles were

1. The parties stated in the oral argument that the case was to test plaintiff's liability for a very large sum of money.

obtained from suppliers, some in the United States and some in other countries, particularly in Japan. At the beginning of his operation plaintiff employed only one or two persons on a part-time basis. Today his business employs approximately thirty persons on a full-time basis.

 When plaintiff began this business in 1946, his operation consisted entirely of handling cane poles, which were sorted, selected, straightened and varnished. In the year 1950, observing that a market for inexpensive cane poles which were cut into sections and fitted with metal ferrules was available to him, he added this line of poles to his business. The purpose of the cutting of the poles is solely to make them more portable. There is no provision made on the poles for attachment of a reel.[2] They are regarded by the trade as cane fishing poles limited to the same use as are the poles which are not cut and fitted with ferrules.

At the time plaintiff entered into this additional activity, he consulted some of his competitors and his accountant in an effort to determine whether he should collect manufacturer's excise tax on these jointed poles. He was advised by his accountant and by one of his competitors who had employed counsel to confer with Mr. Walter A. Scott, Jr., the head of the Excise Sales Tax Division at Jackson, Mississippi, that he was not liable for excise taxes on this type of poles. Following this advice, he made no report of the quantity of jointed poles sold by him prior to 1958, when this matter was brought to a head by the Internal Revenue Department, as will be further outlined infra.

The manufacturer's excise tax was not at that time and is not today imposed on solid cane poles even if they are straightened, scraped and varnished. The Internal Revenue Department seeks only to collect taxes upon poles that are cut and fitted with ferrules in such a manner as they may be reunited into a solid bamboo cane pole.

When the suit was filed to recover the tax paid for the year 1950, plaintiff demanded a jury trial of the question as to whether the jointed bamboo fishing poles were in fact "fishing rods" within the meaning of § 3406(a)(1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3406(a)(1)[3] and, therefore, subject to the manufacturer's excise tax. This demand was honored by the court and the case was tried to a jury. At the conclusion of the trial, the District Judge decided that no factual issue that could be submitted to a jury was presented and took the case away from the jury and disposed of it himself by granting a motion of counsel for the Government for a judgment in its favor. This action on the part of the court constitutes the first assignment of error.

The learned trial judge realized that he was, in directing the jury to find for the appellee, proceeding in a field where there was no decisive precedent:

"The Court: This is about an entirely new aspect of the tax law. * * * I cannot say that I am at all confident that my disposition of the questions that have been raised will even approach being correct. In fact, I feel as if I might have reached top dead center. * * *

"Gentlemen, it is my opinion that Congress did not delegate to laymen the responsibility for interpreting

2. A metal loop is affixed to the end of such pole to which the line may be tied. No importance is attached to this by either party. And the Commissioner did not mention this in his ruling, 58-425, infra, as contributing to appellant's liability for the tax. It is, therefore, considered de minimis and is not discussed hereafter.

3. By which excise taxes are imposed on a large number of items of sporting goods which are "sold by the manufacturer * * *." The item which it is claimed covers plaintiff's product is "fishing rods, creels, reels, and artificial lures, baits, and flies." It is noteworthy that in the first enactment of this statute, § 900(5) Rev.Act of 1918, the underscored words were "fishing rods and reels."

an Act of Congress, wherein the words 'fishing rod' was used. * * *

"It is further my view that Commerce Pacific v. United States of America in [9 Cir.] 278 F.2d 651 is the most persuasive authority for this Court on the basic question of what this article in controversy is. I hold as a fact, and I find that, in my view, it is uncontradicted that this article in question is, within the contemplation of the statute levying the tax, a fishing rod and therefore taxable * * *."

The legal effect of the court's ruling is that, as a matter of law, Congress intended to include bamboo fishing poles such as plaintiff sold in the manufacturer's excise tax levied upon a large number of manufactured articles, typical of which are: " * * * football helmets, harness and goals, basketball goals and uniforms, golf bags and clubs, lacrosse sticks, balls of all kinds, including baseballs, footballs, tennis, golf, lacrosse, billiard and pool balls, *fishing rods and reels,* billiard and pool tables, chess and checkerboards and pieces, dice, * * *," etc.

In our opinion the court erred in holding that cane fishing poles such as appellant sold were included in the phrase *"fishing rods and reels,"* [or the subsequent phrase "fishing rods, creels, reels . . ."] as a matter of law; and that, at least, reasonable minds might have differed as to whether the article before the court was a rod tested by what Congress meant by the words it used. We feel that the argument advanced by the Government before us as to the effect of Commerce-Pacific v. United States of America, 9 Cir., 1960, 287 F.2d 651, is spurious and that it doubtless had a great effect on the lower court in leading it to the conclusion which was reached.

What the Ninth Circuit said in its decision of Commerce-Pacific, Inc. is limited to the facts before the District Court whose decision it was sitting in judg-

ment upon, reported in 175 F.Supp. 227, and to the issues presented to it by that appeal. The poles involved in that case were thus described by the District Judge (175 F.Supp. 228): "These articles come in from two to four sections that can be fitted together. *Each section has string wrapped around the bamboo near the end* [not so here] presumably for support purposes. At the end of the smallest section a metal loop is attached, where fishing line is to be tied or run through. The bamboo is treated with lacquer." [Emphasis added.]

The attitude of perplexity under which the District Judge labored is illustrated by his statement (175 F.Supp. p. 229): "When you come to the distinction between a fishing pole and a fishing rod, you run into a brick wall. Just when a pole becomes a rod or when a rod reverts to a pole to me appears to be an insoluble question."

Commenting on a case relied upon by appellant, the Judge then stated: "The Customs Court view was expressed in National Carloading Corporation v. United States, 36 Customs Court Reports 309 * * *. The Customs Court decided that for purposes of the Tariff Act of 1930, bamboo poles, with a single fitted joint and string wrapped around the bamboo for support, were not 'fishing rods' but were 'fishing tackle' * * *."[4] The critical conclusion of fact reached by the District Court is set forth in these words (175 F.Supp. 229):

"At least the plaintiff has not overcome its *burden of proving by a preponderance of the evidence that the articles involved were not 'fishing rods'.* The rulings of the Commissioner of Internal Revenue are presumptively correct *and I feel the evidence does not justify their disturbance."* [Emphasis added.]

The District Court then went on (ib.) to hold, as an additional reason for its decision, that the burden was upon the tax-

---

4. The Court of Appeals adverted to the fact that this decision of the Customs Court was acquiesced in by the Commissioner in a number of cases, 278 F.2d at 655.

payer to show that he had not passed the tax on to the purchaser and that (page 230) the substantial evidence required to overcome the natural presumption that a tax was passed on was not introduced by the plaintiff. Again, the evidence was not sufficient to sustain the burden of proof—a very important consideration since, under 26 U.S.C.A. § 6416, such proof is a condition precedent to recovery.

The correctness of these two holdings of fact was all that was before the Ninth Circuit and that court was engaged solely in trying the correctness of those two findings. The legal effect of its holding was that the lower court's findings as to the facts were not clearly erroneous. What the Ninth Circuit held, interpreted in the light of what was before it, therefore, does not tend to support the action of the trial court here and not militate against the position of the appellant before us.

As to the second point decided by the District Court in that case, it is stipulated in the case before us that the appellant did not charge the tax or pass it on to the purchaser, and that the reason for this was in part that he relied in good faith upon the assurance of the ranking revenue officials readily available to him

that, in their opinion, he was not liable for the collection of the tax.

And we are not called upon, as was the Ninth Circuit, to test the accuracy of the fact-findings, because in the case before us the jury, the fact-finders, were not permitted to pass upon the vital question which the district court, as fact-finder in Commerce-Pacific, decided against the taxpayer.

The lower court here held that there was no evidence sufficient to warrant submission of the case to the jury, and that alone is the question presented to us.

The appellant put on the stand two witnesses who were manufacturers of fishing equipment and who testified that the poles cut into sections, such as appellant was selling, were commonly known in the trade both by the sellers and the purchasers and the users as fishing poles, and as not embraced within the words used in the statute. These witnesses showed that, in their catalogs, poles such as appellant handled were carried in different sections and under different headings from fishing rods. Both looked upon the appellant's product and gave as their opinions that the article in question was a fishing pole and not a fishing rod.[5]

---

5. Mr. Coats testified that he produced fishing poles, boat paddles and boat oars, and that it was he who had obtained the opinion of the Internal Revenue Department which had been passed along to appellant. This excerpt from his testimony is typical:

"Q. Mr. Coats, do you produce some poles you don't cut into section?

"A. Yes, sir.

"Q. What is the difference between this pole now, and just a long, straight pole that is varnished and the bands aren't there and not cut in sections?

"A. You mean in use?

"Q. The end use.

"A. The same. * * *

"Q. Why do you put the metal ferrules on?

"A. It's more convenient to carry is the only reason.

"Q. After the ferrules are put on to make it convenient to carry to the fishing ground, is there any real difference in the

use of the pole and the nature of it other than those ferrules?

"The Court: He has already said there is no difference. * * * "

The witness Aldridge was president of the Mid-South Sporting Goods Company at Greenwood, Mississippi whose business covered parts of five states. Some excerpts from his testimony will be found illuminating:

"Q. Tell us if there is a distinction recognized in the sporting goods trade between a fishing rod and a fishing pole.

"A. There is.

"Q. Tell us what that is.

"A. A fishing pole is generally a product of nature, such as bamboo. It is generally a one piece pole, but in certain instances, these one piece poles are cut and rejoined, for transportation, for transportation purposes.

"A rod is a mechanical device complete with line guides to retain the line. Made entirely and exclusively, to be used in combination with a reel. A rod is always

Plaintiff offered to introduce a game warden of the State of Alabama, a game warden of the State of Mississippi, the operator of a sporting goods store in Columbus, Mississippi, the operator of a boat dock and sporting goods sales place at Pickwick Lake, and another witness with a similar occupation, and a witness who operated a sporting goods store in the City of Aberdeen. It was stipulated between the parties that the testimony of each of the witnesses would be virtually identical with the testimony which was produced from the witness Aldridge.

Some of this testimony was received without objection; other portions were objected to and ruling reserved. We think that the evidence was admissible. It is clear from all the evidence that there is a distinction between fishing poles and fishing rods; and there was no dispute at all—the appellee putting on no witnesses—that the line drawn between the two terms is not certain, but is one about which people might differ. The testimony showed clearly, however, that generally among those who manufactured, those who sold and distributed poles and rods and those who used them, there was a definite distinction between the meanings ascribed to the word pole and the word rod both by the men in the business and the common laymen.

The trial Judge in the case before us did not indicate the source or sources of information upon which he relied in his holding that, as a matter of law, the fishing poles handled by plaintiff were fishing rods under the statute. Nor is it indicated whether he accepted or relied upon the evidence introduced before him or entirely upon his own knowledge in making the determination. Presumably, he held either that the Commerce-Pacific, Inc. case settled the question before him, or he relied upon his own knowledge. We have indicated that we do not think that the Ninth Circuit case can be construed as settling the law; and if the District Judge relied upon his own knowledge, we assume that we could assume that we are as well informed as he was.

Plaintiff's chief argument is that the term fishing rod is made up of words of art and that all of the proof showed that those familiar with the art were of the opinion that the products upon which the excise tax was levied against plaintiff were not fishing rods. Defendant argues, on the other hand, that the statute is not expressed in technical terms and "is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words" to express. Cf. Addison v. Holly Hill Fruit Products Co., 1943, 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488. It seems to us that a decision as between these points or view would not solve our problem. We draw upon classic words of the Supreme Court as illustrating this statement:

"And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of

equipped with reel seat and also a trigger guard to rest your fingers."

He identified plaintiff's product here in question as a fishing pole, and he exhibited the catalog of his company showing that the pole cut in sections to be joined by ferrules were identified in the catalog as poles and that fishing rods were in a separate section of the catalog. He testified that the two objects had different uses, pointing out that a fishing

pole would not be adaptable to fishing of the nature of casting:

"Q. Why couldn't you cast with one of these poles or rods like you do with a fly rod?

"A. In the first place, bamboo poles are used entirely for live bait fishing. If you spring that pole in any way with force, you spring your bait off. It's only good for lifting out of the water and let the bait swing to you and drop right back."

contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." [6]

And in equally classic words the attitude of defendant is expressed:

"A claim for refund of an estate tax 'alleged to have been erroneously or illegally assessed or collected must be presented to the Commissioner within three years next after the payment of such tax.' On the face of it, this requirement is couched in ordinary English, and, *since no extraneous relevant aids to construction have been called to our attention,* Congress has evidently meant what these words ordinarily convey." [7]

[Emphasis added.]

We must not lose sight of the fact that we are searching for the meaning intended by Congress when it passed the statute before us in 1918 and re-enacted it in 1939. No congressional history sheds light upon the intended meaning of the words. We must keep in mind also that the excise tax involved in this litigation covers plaintiff's business for the year 1950. Those dates are vital when we set about to discover the meaning of the terms in controversy.

It would not be contended, we assume, that the court below or we have the omniscience to decide, from our own knowledge and experience, the meaning of the terms. Doubtless they probably had different meanings in different sections of the country. Perhaps a fisherman on the coast of New England or in the Land O'Lakes region of the midwest were presented with different problems in beguiling the illusive denizens of the waters from their native habitat from the problem which faced the rural population of North Mississippi faring forth to gather a meal or to indulge merely in a sport along the creek banks and from the "fishin' holes" available to them. But the meaning of the words cannot, of course, be varied from one section to another. It would seem that the first place a judge in search of the truth would go in determining the meaning of the words would be to the catalogs and to the testimony of those who were in the business of furnishing the trade with poles and rods and to those who were accustomed to use them. A judge so situated would also be likely to seek the aid of the nearby experts appointed to construe the statute and collect the tax and to give such evidence considerable weight. These would seem to supply the "extraneous relevant aids to construction" adverted to in the quotation supra.

■ Another accepted aid to construction is that "The meaning of a word may be ascertained by reference to those associated with it,"—*noscitur a sociis.*[8]

The statute under construction levies the manufacturer's excise tax upon assorted items of equipment used in sports. An examination of the statute will reveal that practically all of the more than thirty items included in it [9] consist of products of the manufacturing art wherein the raw materials furnished by nature have been fabricated into something entirely different from what nature had provided. This is certainly true of reels, the items with which the crucial word "rods" is always closely associated in

6. Morissette v. United States, 1952, 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L. Ed. 288.

7. Rosenman et al. v. United States, 1944, 323 U.S. 658, 661, 65 S.Ct. 536, 537, 89 L.Ed. 535.

8. "Latin for Lawyers," Sweet & Maxwell, Ltd., 1937, Maxim No. 716, page 208:

"It is a rule laid down by Lord Bacon that the coupling of words together shows that they are to be understood in the same sense * * *. And where the meaning of a particular word is doubtful or obscured, or where a particular expression when taken singly is inoperative, the intention of a party who used it may frequently be ascertained by looking at adjoining words, or at expressions occurring in other parts of the same instrument * * *."

9. E. g., Badminton rackets, billiard tables, clay pigeons and traps for throwing them, croquet balls, golf balls and clubs, artificial lures, etc.

every version of the statute. Iron ore, nickel, the chemicals which form plastics, and many other things are subjected to the art of the manufacturer to produce a reel, and a reel serves a vastly different purpose from that which the raw material could furnish.

Here, then, seems to be the logical test to be applied in determining what Congress was doing. It was levying an excise tax upon the sale of articles manufactured by processes simple or complex so that something usable would be produced where it did not exist in the form which nature had furnished. Subjected to that test, plaintiff's poles were not rods within the meaning of the statute. When the manufacturer's art was applied to the bamboo pole, it had absolutely no greater utility for fishing than it had as nature had fashioned it. The angler had no better fishing pole after the original pole had been cut in pieces and reassembled than he had before the cutting process was begun.

That the Commissioner seems to accept this test of enhanced usability seems exemplified by a private ruling issued in 1958, which evidently formed the predicate for the assessment of this tax so many years after the plaintiff had performed the acts now sought to be subjected to the manufacturer's excise tax.[10]

It is manifestly the idea of the defendant that a pole may be straightened and varnished to make it more usable to a fisherman without incurring tax liability; but if, in addition, a pole is cut into sections purely for convenience in transporting it to the fishing grounds, the tax does apply, although a pole cut in pieces certainly has no more utility to the fisherman, and probably less.

When these relevant extraneous aids to construction have been utilized, the judicial mind is instructed so that it can, without difficulty, delineate the boundaries of the test which the jury should apply to appellant's product in determining whether it comes within the wording of the statute. It seems clear to us that the evidence offered by the appellant requires that we hold, at least, that the court below erred in granting a directed verdict in favor of defendant.

Plaintiff next contends that the Government is barred by equitable estoppel buttressed by § 1108(b) of the Revenue Act of 1926 [11] from imposing the tax upon plaintiff for the year 1950 and all subsequent years prior to 1958. It was stated in the argument that the tax had been collected and paid since that date when the ruling copied in part supra was promulgated. Plaintiff argues that the manufacturer's excise tax is entirely different from an income tax; that the law forces manufacturers to collect the tax at the time they make the sale of their merchandise by adding the tax to the price of the merchandise; and also that it is illegal for the manufacturer to collect the tax unless he passes it on to the Government.

His position is further that the manufacturer is entitled to know if he is lia-

---

10. Rev.Rul. 58–425, 1958–2 Cum.Bull. 804, which reads in part as follows: "The manufacturer's excise tax on sporting goods does not apply to sales of full length bamboo cane poles which are merely straightened, scraped and varnished, but does apply to sales of bamboo cane poles which are scraped, varnished, cut into sections and fitted with ferrules or other means whereby they may be joined together * * *."

The defendant does not argue that this ruling can have any retroactive effect, and presumably appears as an appendix to its brief merely to show the Commissioner's attitude as of that time to the poles in which plaintiff was dealing. And cf. Tomlinson, District Director, etc. v. Massey, 5 Cir., 1962, 308 F.2d 168.

11. "No tax shall be levied, assessed, or collected under the provisions of Title VI of this Act on any article sold or leased by the manufacturer, producer, or importer, if at the time of the sale or lease there was an existing ruling, regulation, or Treasury decision holding that the sale or lease of such article was not taxable, and the manufacturer, producer, or importer parted with possession or ownership of such article, relying upon the ruling, regulation, or Treasury decision." 26 U.S.C.A. Int.Rev.Acts.

ble for the tax before he has any right to impose it upon customers; and that, having made all of his sales prior to 1958 without collecting the tax and in reliance upon the practices of the Commissioner and upon the advice given by the Excise Sales Tax Division of the Internal Revenue Service, he cannot, in good conscience, be forced to pay it seven years later. Plaintiff argues that this case makes the strongest possible appeal for the application of the doctrine of equitable estoppel, because he made every effort to ascertain the attitude of the Government before entering into the business, and the only advice he got was that, in Mr. Scott's opinion and that of his associates, the tax ought not to be collected.

■ It is well settled that the doctrine of equitable estoppel, in proper circumstances, and with appropriate caution, may be invoked against the United States in cases involving internal revenue taxation. Joseph Eichelberger & Co. v. Commissioner, 5 Cir., 1937, 88 F.2d 874; Perkins et al. v. Thomas, Collector, 5 Cir., 1937, 86 F.2d 954, affirmed, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324. And cf. Stockstrom v. Commissioner, 1951, 88 U.S.App.D.C. 286, 190 F.2d 283, 30 A.L.R.2d 443.

Plaintiff further argues that privity is not a necessity to equitable estoppel if the representation relied upon is made under such circumstances as to indicate that it was intended to and would reach others, citing 31 C.J.S. Estoppel § 130, p. 398. He contends further that it is common knowledge that rulings on excise tax questions are usually and generally circulated among manufacturers of similar objects, 13 Journal of Taxation 25 (1960); and that the communication of the ruling of Commissioner's agent to plaintiff's competitor and from him to plaintiff is clearly established by the record and follows known trade practices.

The argument is persuasive and will doubtless be made before the District Court upon a further trial. We do not find it necessary to decide this question

now in view of our disposition of the case on another point.

The judgment of the District Court is reversed and the case is remanded for another trial consistent with our holdings above.

Reversed and Remanded.

JONES, Circuit Judge (dissenting).

The majority would permit an estoppel against the United States because it did not inform the appellant, prior to the time for which the tax was assessed, of its construction of the statute. Estoppel must be based on representation or concealment of facts and not as to matters of law. First National Bank of Montgomery v. United States, D.C.N.D.Ala. 1959, 176 F.Supp. 768, aff. 5 Cir., 285 F.2d 123.

The tax is imposed by the statute. If, under the statute the appellant's fishing pole is a fishing rod, the lack of a ruling by the Commissioner would not exempt it from the tax. If, under the statute, the appellant's fishing pole is not a fishing rod, a ruling of the Commissioner would not make it so. In neither case would a tax liability or exemption result from the appellant's knowledge or lack of knowledge of a Commissioner's ruling.

The exact question here, as I read the record, decided against the Government was decided against the taxpayer in Commerce-Pacific, Inc. v. United States, 9th Cir. 1960, 278 F.2d 651. In the opinion of the court it was said:

"In our view the district court correctly decided that the jointed bamboo cane poles here in issue are 'fishing rods' within the meaning of Section 4161 of the Internal Revenue Code of 1954. They were therefore, properly taxable and the judgment of the lower court must be and is affirmed." 278 F.2d 651, 655.

The majority distinguish the Ninth Circuit case because there each section of the rod, or pole, has string wrapped around the bamboo near the end, and here there is no string wrapping. I hope my

brothers of the majority will not think me lacking in respect if I suggest that they have a rather tenuous string with which to hang their distinction. I would follow the Commerce-Pacific case. Therefore I DISSENT.