**SOUTHERN HARDWOOD TRAFFIC ASSOCIATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. C–67–103.**

United States District Court
W. D. Tennessee, W. D.
March 13, 1968.

---

Hubert A. McBride, Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, Tenn., for plaintiff.

Mitchell Rogovin, Asst. Atty. Gen., Stanley F. Krysa and Sherin V. Reynolds, Attys., Dept. of Justice, Washington, D. C., Thomas L. Robinson, U. S. Atty., Memphis, Tenn., for defendant.

## OPINION

BAILEY BROWN, Chief Judge.

This is an action for refund of federal income taxes and assessed interest for the years 1960 through 1962 in the amount of $10,603.44 plus interest.

A hearing without a jury has been held, and we have had the benefit of pre- and post-trial memoranda. In addition, counsel have stipulated most of the relevant facts. Plaintiff contends, which the Government denies, that it is an exempt organization under 26 U.S.C.A. § 501. There is further disagreement as to whether the Government is estopped, for the years involved, to contend that plaintiff is not an exempt organization. While the Government has moved for a summary judgment to which it might well be entitled, since there has been a plenary hearing, we prefer to render a decision based on all the evidence.

Plaintiff, Southern Hardwood Traffic Association (hereinafter, SHTA), was organized in 1911 and is an unincorporated association of individuals, partnerships and corporations who are engaged in the manufacture or handling of wood products. During 1960–62, SHTA had between 183 and 191 members and its only sources of income were (1) membership dues and (2) commissions it received from the collection of freight claims and transit refunds for its members. SHTA's headquarters is in Memphis, but it also maintains district offices in Memphis, Knoxville, Louisville and New Orleans. In addition to the executive vice-president, who is the only salaried officer of the association, SHTA employs a total of fifteen other persons in these four cities.

Article II of SHTA's Constitution and By-Laws provides:

"The objects of this Association are to secure for its members the advantages of combined action in dealing with transportation problems; to seek the establishment and maintenance of freight rates upon forest products and other commodities in which members are interested, which shall permit their widest distribution, commensurate with a due regard of the rights of the carriers; to maintain a Traffic Organization which shall acquire and disseminate information regarding changes or proposed changes in freight rates and regulations regarding forest prod-

ucts and other commodities; to facilitate the adjustment of freight claims and to assist its members in all negotiations with carriers; to do and perform all such other acts as may conduce to the welfare of its members."

In one of SHTA's publications entitled "Advantages of Membership in the Southern Hardwood Traffic Association," which the proof shows to be a fair summary of its services, SHTA proposes to prospective members that the following "MAJOR SERVICES" are available to its members:

"SECURES FAIR ADJUSTMENT OF FREIGHT RATES and removes unjust discrimination.

INTERPRETS AND SECURES FAIR APPLICATION OF THE EXTREMELY COMPLICATED FREIGHT RATE TARIFFS by the railroads and the Interstate Commerce and State Commissions.

WHEN REQUIRED, INITIATES COMPLAINTS BEFORE THE INTERSTATE COMMERCE COMMISSION, INTERVENES AND DEFENDS THE HARDWOOD RATE ADJUSTMENTS FROM ATTACKS BY OTHER INTERESTS, before the I.C.C. and State Commissions, as required.

IMMEDIATE NOTIFICATION OF MEMBERS OF CHANGES and proposed changes in their rates.

SECURES PROPER CLASSIFICATION OF PRODUCTS OF THE FORESTS.

QUOTES TO MEMBERS THE LOWEST LEGAL FREIGHT RATES, the best routes and terminal deliveries. The present extremely complicated rate situation makes this service invaluable to those buying and selling on delivered prices.

BILLS AND RECONSIGNS FREIGHT when requested by members.

TRACES CARS and rushes them through to destination.

ASSISTS IN OBTAINING CARS FOR LOADING in times of car shortages.

MAINTAINS AN EXCELLENT CLAIM DEPARTMENT. Audits your freight bills, files and collects claims for over-charges, making only a small 15% charge for the recovery. This service alone more than pays the dues of many members. MORE THAN TWO MILLION DOLLARS COLLECTED FOR MEMBERS.

MAINTAINS THE BEST ROUGH MATERIAL AND TRANSIT DEPARTMENT IN THE HARDWOOD REGION. Affords members the best advice for use of transit arrangements. Keeps records of members when desired. A very valuable service."

It can therefore be seen that some of the services performed by SHTA are general services calculated to benefit the membership as a whole (such as the dissemination of information regarding changes in freight rates and regulations), whereas other services (such as the collection of freight claims on particular shipments) are individual services calculated to benefit those members who take advantage of such services. It is the hybrid nature of the purposes and activities of this organization—partly to promote common business interests and partly to engage in a regular business of a kind ordinarily carried on for profit and thereby to render services for individual members—which has given rise to this controversy over whether it is a "business league" and therefore an exempt organization. 26 U.S.C.A. § 501(c) (6).

We will not attempt to describe at length all of the services which SHTA provides, because no contention has been made that SHTA does not provide many services for the hardwood lumber industry which are general in nature, which promote the common interests of the industry as a whole, and which are beneficial and useful to all its members. In addition to the first five "Advantages of

Membership" set forth above, the general services provided by SHTA include attending conferences on behalf of the industry, publishing newsletters and other informative documents, reporting and supporting legislation favorable to the industry, and conducting negotiations on behalf of the industry with railroads and other carriers. These are not in controversy.

However, SHTA also performs a variety of individual services of a type which might normally be performed by an association organized for profit:

(1) SHTA quoted 133,819 rates and routes on individual shipments to members who requested this information in 1960. In 1961 and 1962, the figures were 126,594 and 121,131, respectively.

(2) SHTA prepared bills of lading for, and traced, and reconsigned 10,319 individual shipments on request of its members in 1960. Comparable figures for 1961–62 were 10,441 and 12,769.

(3) SHTA collected a total of $291,469.69 in freight claims and transit refunds for its members in 1960, according to the "Report of the Executive Vice President." In 1961–62, it collected $266,163.04 and $282,211.43, respectively, according to those reports.

(4) SHTA maintains a Rough Material and Transit Department, and in connection with this, it keeps records for seven of its members relating to the amount of rough materials (as opposed to finished materials or products) shipped by them over various railway lines.

The proof shows that some of SHTA's members do not avail themselves of any of these individual services and that no additional charge is made for any of the individual services provided for any member, except in the case of collecting freight claims and transit refunds. In the event a member turns over a freight or transit claim to SHTA for collection, SHTA charges a fee ranging from 8% to 15% of the amount collected (as opposed to 50% for similar services by commercial agencies), the remainder so collected being returned to the member

seeking SHTA's assistance. The commissions which SHTA received amounted to $22,806.59 in 1960, $19,446.00 in 1961, and $22,925.76 in 1962, and in each year constituted approximately 15% of its total revenue. The remaining 85% of SHTA's revenue came from membership dues assessed against the individual member on the basis of the member's net worth.

In 1942, under the then applicable provisions of the Internal Revenue Code, SHTA filed a request with the Deputy Commissioner of Internal Revenue for a determination that it was an exempt organization, but the Deputy Commissioner determined that it was not. Later that same year, SHTA further corresponded with the Internal Revenue Service regarding its status as an exempt organization, which eventually culminated in a conference with the Division Chief of the Memphis Office of the IRS. The Division Chief stated as his opinion that SHTA could not be taxed on its revenue from membership dues and that its only taxable revenue came from the commissions it earned from freight and transit claim collections. Thus he determined that SHTA was an exempt organization and that therefore only its unrelated business income was taxable. When he was informed that the expenses of collecting these claims exceeded the revenue received from the commissions SHTA earned from collecting them, the Division Chief suggested that SHTA report its freight and transit claim commissions as income and deduct its expenses attributable to collecting these claims and that he would then issue a "No Tax Report." This same plan of reporting was followed in every succeeding year by SHTA and resulted in a reported loss for the involved years of $2,455.96 in 1960, $7,474.64 in 1961, and $2,621.75 in 1962, even though SHTA actually had net profits (counting *all* income less *all* expenses) of $15,797.99 in 1960, $12,058.76 in 1961, and $16,211.20 in 1962. The returns for these three years were subsequently examined and audited by an agent of the IRS, who concluded that SHTA was not

an exempt organization, and resulted in the issuance in 1964 of a statutory notice of deficiency. The deficiency and interest thereon was paid under protest; timely claims for refunds were filed; and in 1965 plaintiff was notified of the disallowance of its claims. Consequently, SHTA, having exhausted its administrative remedies, filed this action for refund.

SHTA contends: (1) that under 26 U.S.C.A. § 501(a), it was an exempt organization since it was a "business league" under § 501(c) (6) and, since it had no unrelated business income, it was totally exempt from taxation; (2) that even if its commissions on claims collected were unrelated business income, it was, as an exempt organization, taxable only as to such income, and since its expenses incurred in making the collections exceeded its income therefrom, it owed no taxes; and (3) that in any event, the Government is estopped to apply the "revocation" of its partially tax-exempt status retroactively to the years 1960–62.

On the other hand, the Government contends: (1) that SHTA is not a "business league," is not exempt from taxation, and therefore should report *all* of its income and *all* of its expenses for the determination of its tax liability (which position resulted in the deficiencies as assessed); (2) that even if SHTA, to the extent of its income derived from membership dues, is exempt from taxation, the method which it follows in determining expenses attributable to unrelated business income (commissions) is inaccurate and should not be followed; and (3) the Government is not estopped to apply the "revocation" retroactively.

Under 26 U.S.C.A. § 501(c) (6), a "business league" which is "not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual" is an exempt organization. Treasury Regulation § 1.501(c) (6)–1, which "has not been changed since 1929 and has the force and effect of law," American Ply-

wood Association v. United States, 267 F. Supp. 830, 832 (W.D.Wash.1967), defines a "business league" as follows:

"A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. * * * Organizations otherwise exempt from tax under this section are taxable upon their unrelated business taxable income. * * "

It has also been determined, it should be said for completeness, that an exemption must be denied to organizations chartered as business corporations, Clay Sewer Pipe Assn., Inc. v. Commissioner of Internal Revenue, 139 F.2d 130, 134 (3rd Cir. 1943); and to organizations which could pay dividends to members, Louisville Credit Men's Adjustment Bureau v. United States, 6 F.Supp. 196, 199 (W.D.Ky.1934); and to organizations whose members do not have a common *business* interest, Chattanooga Automobile Club v. Commissioner of Internal Revenue, 182 F.2d 551, 554 (6th Cir. 1950).

Applying the above tests to SHTA, we find that (1) it is not *organized* for profit; (2) no part of its net earnings inures to the benefit of any private shareholder or individual; (3) its members have a common business interest; (4) it is not chartered as a business corporation; (5) it pays no dividends to its members; (6) at least in part, its purpose is to promote

the common interest of its members; (7) at least in part, it does not engage in a regular business of a kind ordinarily carried on for profit; and (8) at least in part, its activities are directed to the improvement of business conditions of a line of business as distinguished from the performance of particular services for individual members. However, we further find that, at least in part, SHTA also engages in a business of a kind ordinarily carried on for profit, and also performs particular services for some of its individual members. Therefore, we conclude that SHTA's status as an exempt organization turns entirely on whether the business activities in which it engages and the individual services it performs are *merely incidental*, as SHTA contends, to its other activities taken as a whole.

Any particular activity or service performed by SHTA, which does not inure to the benefit of all of its members generally and which would otherwise have to be done by or for the member in order for him to properly perform his business, must be classified as an individual service. Thus, each time SHTA quotes a rate or route, prepares a bill of lading, traces or reconsigns a shipment, assists in finding cars for loading, collects or attempts to collect a freight claim or transit refund, or keeps rough material shipment records, it is performing an individual service. Plaintiff insists that, since only approximately 15% of its income is derived from performing individual services, it follows that only 15% of its services are 'individual services for members. We disagree. Since SHTA reported that its expenses incurred in collecting freight and transit claims exceeded its income from the commissions it earned, it must be true that part of the membership dues was used to defray part of the cost of collecting claims and all of the cost of furnishing other individual services for which no charge was made. Although precisely how much of the membership dues were so used is not shown by the proof, from the volume of such individual services, it would appear to be a considerable part of the dues. In short, SHTA is simply not making charges for many of its individual services and is charging only part of the cost of collecting claims. If SHTA's reasoning were correct, it would follow that if it had made no charges for collecting claims, it would have performed no individual services for members. Thus we conclude that the percentage of income derived from performing individual services is a totally unrealistic test to apply in the determination of their *incidental* nature.

We think the only adequate test to apply in determining whether the individual services performed by this organization are incidental to its alleged "main" purpose is the amount of time devoted by all the employees of the organization to the performance of these individual services in contrast with the amount of time devoted to those services which are of common interest and equal benefit to all the members.

The proof is not altogether clear on this point. SHTA's executive vice-president, the only witness at the hearing, did testify that virtually all of his own time was spent on activities which we have heretofore described as "general services." He also testified that most of the time of the four district managers was also devoted to "general services." He further testified that he "couldn't say" how much time SHTA employees spent preparing bills of lading and tracing and reconsigning freight; that they spent "much less than 10%" of their time arranging for members to obtain railroad cars in times of car shortages; that "less than 50%" was spent quoting rates and routes; and "less than 25%" collecting freight and transit claims. These are obviously rough estimates,[1] and are en-

---

1. We have spent some of our own time making estimates. An employee who could quote a rate and route at the re-

markable speed of one per minute would have required almost 56 forty-hour weeks to have completed his task for 1960

titled to be given weight only as such. Under the circumstances, while it is obvious that no amount of time can accurately be assigned to the quoting of 133,819 rates and routes or to the billing, tracing or reconsigning of 10,319 individual shipments or to the collection of almost $300,000 worth of freight claims or to the maintenance of records on rough material shipments or to finding an undetermined number of cars in times of shortages of cars—all of which inured to the individual benefit of certain members in 1960 alone, it is equally obvious that such activities consumed more than an inconsequential amount of the time of an organization with only sixteen salaried employees.[2]

■ We have carefully considered all relevant cases cited by counsel and many not cited to determine the applicable legal principles involved in "business league" exemption cases; but as has often been said, when applying these legal principles to a factual situation, each case must rest on its own merits, and a statute creating an exemption must be strictly construed.

See, e. g., American Fishermen's Tuna Boat Assn. v. Rogan, 51 F.Supp. 933, 936 (S.D.Calif.1943).

■ Under the facts as presented, we therefore conclude that SHTA, in part, engaged in a regular business of providing individual services of a kind ordinarily carried on for profit to a majority of its members; that the providing of such services to its members constituted one of its two main purposes; that the providing of these individual business services constituted not an incidental but a substantial part of its total activity; that it was therefore not a business league; and that, as operated, it was not to any extent entitled to a tax-exempt status.

However, plaintiff argues that even if it should have paid the taxes in 1960–62 for which it now seeks a refund, the Government is equitably estopped to retroactively determine that plaintiff should have paid those taxes because of the local Division Chief's orally rendered opinion of 1942 on which plaintiff subsequently relied. The parties seem to assume, and

(when 133,819 rates and routes were quoted). Another employee who could trace and reconsign a lost shipment at the equally remarkable speed of one every ten minutes would have required over 43 forty-hour weeks to have completed his task for 1960 (when 10,319 shipments were billed, traced and reconsigned).

2. Membership in SHTA is demonstrably profitable in a very real sense for many members. Tables submitted in the stipulation disclose that in 1960, SHTA collected $265,859.45 (no explanation is given why the figure of $291,469.69 used in the "Report of the Executive Vice President" hereinabove set out varies from the total in the tables submitted in the stipulation) in freight claims for 105 (out of 191) members. It reported earning $22,806.59 in commissions from collecting these freight claims. These same 105 members paid $82,944.00 in membership dues that year. Therefore, 105 (or 55%) of the members paid a total of $105,750.59 in membership dues and freight claim commissions (the average commission being 8.59% of the amount collected) and had $265,859.45 in freight claims collected for them, for a net return to

these members of $160,108.86. Had these same members used a commercial collection agency to collect $265,859.45 in freight claims, at the regular 50% commission rate, they would only have received $132,929.73 in return. Thus, the collection of these freight claims by SHTA, taken as a whole, not only more than paid for the commission charges and membership dues of 55% of the members, but effected them an additional saving of $27,179.13 as well. Some of these 105 members undoubtedly availed themselves of the other individual services provided at no charge by SHTA—services they otherwise would have had to pay for if done by a commercial organization—and thus effected further savings for themselves.

On the other hand, 86 of the 191 members (or 45%) paid a total of $57,482.27 in membership dues according to the tables in the stipulation (or 41% of the total dues paid), but received no freight claim or transit refunds. Some of these 86 members may have taken advantage of the other free individual services provided by SHTA, however.

therefore we assume, that the relevant facts were the same in 1942 as they were in 1960–62.

■ It cannot be questioned that the rule generally applicable to all dealings with Government agents is well stated in Flamm v. Ribicoff, 203 F.Supp. 507, 510 (S.D.N.Y.1961):

"* * * Parties dealing with the Government are charged with knowledge of and are bound by statutes and lawfully promulgated regulations despite reliance to their pecuniary detriment upon incorrect information received from Government agents or employees."

and by the Supreme Court in Wilber National Bank of Oneonta, N. Y. v. United States, 294 U.S. 120, 123–124, 55 S.Ct. 362, 364, 79 L.Ed. 798 (1935):

"Undoubtedly, the general rule is that the United States are neither bound nor estopped by the acts of their officers and agents in entering into an agreement or arrangement to do or cause to be done what the law does not sanction or permit. Also, those dealing with an agent of the United States must be held to have had notice of the limitation of his authority."

Nevertheless, in appropriate circumstances, governed perhaps by a sense of fairness applied to a particular case, some courts have occasionally excepted to this general rule. Thus, in Simmons v. United States, 308 F.2d 938 (5th Cir. 1962), the taxpayer had been orally advised in 1950 by the head of the Excise Sales Tax Division at Jackson, Mississippi, that cane fishing poles were not subject to excise taxes; and he then sold many such poles to his customers from 1950 through 1958 without collecting excise taxes on his sales. The Commissioner then issued a Revenue Ruling, for the first time, in 1958 (not at taxpayer's request) that such poles were subject to excise taxes, and the Government assessed back taxes against this taxpayer for eight years. Reversing the lower court's directed verdict for the Government, the Court of Appeals for the Fifth Circuit, on remand, intimated that taxpayer's argument for estoppel against the Government was "persuasive." Other such cases could be cited.

■■ However, it is clear that equitable estoppel against the Government cannot be invoked where the Government has acted to correct a mistake of law, but only where the mistake has been a factual one. Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 183, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). It is further clear that in most cases the doctrine is only applied when:

"* * * (1) the Government has waived sovereign immunity from liability and from suit, (2) the agent by whose conduct the Government is sought to be bound acted within the limits of authority lawfully conferred, and (3) the estoppel claimed would give the citizen nothing more than that which admittedly is his substantive right, and would not work a violation of law."

Smale & Robinson, Inc. v. United States, 123 F.Supp. 457, 467 (S.D.Calif.1954); Interstate Fire Insurance Co. v. United States, 215 F.Supp. 586, 599 (E.D.Tenn. 1963), affirmed 339 F.2d 603 (6th Cir. 1964). It would further seem logical to say, in light of the above cases, that the taxpayer must have relied on such erroneous advice to his overall detriment. Finally, "estoppel should be applied against the Government with utmost caution and restraint." Schuster v. Commissioner of Internal Revenue, 312 F.2d 311, 317 (9th Cir. 1962); Simmons v. United States, supra, 308 F.2d at 945.

■ We do not think this case is one in which estoppel should be applied. First, in spite of the original private ruling of the Deputy Commissioner of Internal Revenue that SHTA was not an exempt organization, SHTA continued to press its case on a lower level and chose to rely on the oral advice of a relatively minor official that its income from membership dues was exempt. Second, we have now ruled as a matter of law that all

of SHTA's income was taxable, and therefore the Division Chief's opinion that part of SHTA's income was not taxable was a mistake of law, not of fact. Finally, it cannot be said that plaintiff relied on the Division Chief's advice to its overall detriment. Even though the Government did retroactively assess taxes against SHTA for a period of three years, by following the advice of the Division Chief, SHTA enjoyed twenty-two years in which it did not pay and will not have to pay taxes on the major part of its income.

We therefore find and conclude that SHTA is not entitled to a refund for any of the involved years.