**NORTON MANUFACTURING CORPORATION, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 66 C 1030.**

United States District Court
N. D. Illinois, E. D.
June 14, 1968.

Murphy & Pearson, Chicago, Ill., for plaintiff.

Edward V. Hanrahan, U. S. Atty., Eugene Robinson, Asst. U. S. Atty., Chicago, Ill., for the Government.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

MAROVITZ, District Judge.

This is an action seeking refund from the United States, of manufacturers' excise taxes assessed and collected pursuant to the provisions of Section 3406(a) (1) of the Internal Revenue Code of 1939, and Section 4161 of the Internal Revenue Code of 1954.[1] The original complaint of plaintiff Norton Manufacturing Company, relied on 23 separate claims for refund filed with the Internal Revenue Service. All of such claims were disallowed by the Commissioner. The parties have since stipulated that claims 1–10 were not filed timely

enough, so that only claims 11–23, which total $50,422.51,[2] remain for decision. The parties have filed cross-motions for summary judgment. Plaintiff's motion is supported by several affidavits and a number of documentary exhibits. The parties have agreed to a stipulation of facts, which sets forth all of the essential facts, and presents the narrow issue involved.

The dispute is essentially a semantic one. Section 4161 provides for the collection of a 10% manufacturers' excise tax "upon the sale of fishing rods, creels, reels, and artificial lures, baits and flies (including parts or accessories of such articles sold on or in connection therewith, or with the sale thereof) * * * ".

For about twenty years, plaintiff has been in the business of importing lengths of bamboo cane, which fall into two classifications; those eight to ten feet long, and those eleven feet or longer. The eight to ten foot lengths are cut into two sections by plaintiff, and the longer lengths are cut into three sections. The lengths of bamboo are cleaned, straightened. if necessary, and ordinarily varnished. After cutting they are fitted with either brass, aluminum or steel ferrules of a screw-lock type or of a tapered self-locking type. A small wire loop is fitted at the far end of the last piece of the bamboo, which is used to tie or secure a fishing line. The fisherman merely locks the lengths together before using. The bamboo is cut into lengths solely for ease of transportation, but performs exactly the same fishing function as would an uncut length of bamboo.

Plaintiff contends that its product constitutes a "fishing pole" rather than a "fishing rod," and is not subject to the tax imposed by sections 3406(a) (1) and 4161.

1. Section 3406(a) (1) of the 1939 Code is the predecessor of Section 4161 of the 1954 Code.

2. The parties have stipulated that a tax in the sum of $988.79, for which a refund claim was made, was properly assessed and paid. This reduces the claimed refunds in claims 11–23 from $51,441.30 to the present claim for damages.

An identical factual situation has previously been presented to two United States' Courts of Appeal, which have reached opposing conclusions on the issue. In Commerce-Pacific Inc. v. United States, 278 F.2d 651 (9th Cir. 1960), the Ninth Circuit upheld the district court's finding that jointed bamboo cane poles, virtually identical to the ones in issue, constituted "fishing rods" and were subject to the § 3406 excise tax. On the other hand, in Simmons v. United States, 308 F.2d 938 (5th Cir. 1962), the Fifth Circuit reversed the district court's entry of a directed verdict to the effect that identical poles constituted "fishing rods" under § 3406 as a matter of law. Although not expressly ruling on the merits, and only holding that at least a question of fact for the jury existed, the Court strongly asserted its own view that jointed bamboo poles are not "fishing rods" subject to taxation.

The question is pre-eminently one of statutory interpretation. But the legislative history affords little clue to the intent of the lawmakers, if indeed there was any consideration of the scope of the term "fishing rods". In 1918, Congress first imposed excise taxes on sporting goods. Included were "fishing rods and reels" and the statute ended with a catch-all clause including "and all similar articles commonly or commercially known as sporting goods". The tax was repealed, but was re-enacted in 1932, again reciting "fishing rods and reels" with the same catch-all phrase. The 1932 tax was repealed in 1938.

The Internal Revenue Act of 1941, which amended the 1939 Code, again imposed an excise tax, but the phrase used in the Act was enlarged to "fishing rods, creels, reels, and artificial lures, baits and flies" (the same as the present statute), and this time there was not a catch-all clause. This was Section 3406(a)(1) of the 1939 Code. In proceedings before the House Ways and Means Committee, Congressman Reed stated on June 30, 1941: "The tax will be imposed on a specific list of items, as set forth in the Bill rather than on sporting goods as a class. This is to avoid confusion." 87 Cong.Rec. 6486, 77th Cong., 1st Sess.

The 1954 Internal Revenue Code carried over the same language used in the 1941 amendment to the 1939 Code, and changed the section number to 4161.

In 1965, the excise tax on all classes of sporting goods was repealed except as to "fishing rods, creels, reels and artificial lures, baits and flies". The Senate Finance Committee Report on Pub.L. 89–44 explained that the 1941 excise tax had singled out certain items of sporting equipment for taxation, and left other items untaxed, which represented a discriminatory tax on limited forms of recreation. The Bill before Congress eliminated this source of discriminatory tax treatment on all of the sporting goods items except "fishing rods, creels, reels and artificial lures, baits and flies". The Report explains that the tax on fishing rods, etc., was retained because the revenue therefrom was distributed to aid the states in their conservation programs, pursuant to 16 U.S.C. § 777b.

■ The history offers no explicit help in resolving the issue before the Court. However, it makes clear that § 4161 and its predecessor were designed to impose a tax on a "specific list of items". The law is relatively clear that a taxing provision, as opposed to an exemptive provision, should be construed strictly against the Government and any doubt should be resolved in favor of the taxpayer. Gould v. Gould, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211 (1917); Tandy Leather Co. v. United States, 347 F.2d 693 (5th Cir. 1965); The Cordon v. United States, 46 F.2d 719, 723 (Ct.Cl. 1931); 1 Mertens, Law of Federal Income Taxation, § 3.07; Cf. Endler v. United States, 110 F.Supp. 945 (D.N.J. 1953).

■ The words of a statute are usually construed according to their common and ordinary meaning. Norris Dispensers, Inc. v. United States, 211 F.Supp. 79, 81 (D.Minn.1962); Grange Insurance Assn. of California v. Com-

missioner, 317 F.2d 222, 224 (9th Cir. 1963); Hine v. United States, 113 F. Supp. 340, 125 Ct.Cl. 836 (1953). Plaintiff argues, however, that where a tax statute is directed at a particular industry, trade, business or profession, then the terms relating thereto should be construed in the sense in which the terms are generally used in said industry or trade. Carter v. Liquid Carbonic Pacific Corp., 97 F.2d 1, 3 (9th Cir. 1938); O'Hara v. Luckenbach S.S. Co., 269 U.S. 364, 46 S.Ct. 157, 70 L.Ed. 313 (1926).

In *Commerce-Pacific*, unlike this case, the plaintiff conceded that construction of the words of the statute should be based on their ordinary and everyday meaning. On that basis, the court essentially applied a dictionary definition test to the issue. The dictionary used[3] contained the following definitions: "Rod; a support for a fishing line, a fish pole". "Fishing Pole; a slender tapering pole to which a line is attached, used in fishing". "Fishing Rod; a springy tapering rod of wood, split bamboo, steel etc., *made with several joints* and used in fishing". (emphasis added). In finding for the Government, the Court placed emphasis upon the absence of the term "joints" from the definition of "fishing pole", and stressed the similarity between the definition of fishing rods, which included "joints", and the construction of the jointed bamboo poles in issue. It concluded that the district court's finding of fact on the issue was not "clearly erroneous", and should be affirmed.

Of course, this Court, as a trial court, is not confronted by the same issue as an appellate court reviewing a lower court's finding of fact. We must only determine as a matter of law, an ultimate issue of "fact", as to the construction of a statute. Plaintiff contends, first, that we should ahere to the rationale of *Simmons* over that of *Commerce-Pacific*, and second, that under either a standard of ordinary and everyday meaning, or one of commercial usage, its

product is a "fishing pole" rather than a "fishing rod".

Initially, we should note that in Revenue Ruling 58–425 (Cum.Bull.1958–2, p. 804), the Service stated its position to be that jointed bamboo cane poles constituted "fishing rods" under § 4161. On the basis of the ruling, the Service disallowed the refund claims in this case. The Ruling stated that bamboo cane poles, which are not cut into sections, whether in their natural state or straightened, scraped and varnished, "are not regarded as being either manufactured or designed for fishing purposes". On the other hand, "where cane poles are cut into sections and fitted with ferrules or other means whereby they may be joined together, they are considered to be manufactured and designed for fishing purposes". The Ruling further stated:

> "Accordingly, it is held that the manufacturers' excise tax does not apply to sales of the poles in the first situation described above [uncut poles], since they are not materially changed in design from their natural state. On the other hand, the jointed cane poles in the second situation described above [cut poles] are considered to have been materially changed in design from their natural state and are suitable for fishing purposes. Therefore, they are considered to be fishing rods and the company's sales of such rods are subject to the manufacturers' excise tax imposed by section 4161 of the Code."

The basis for the distinction was the belief that bamboo poles which are cut into sections, whether in their natural state, or straightened, scraped and varnished, have been materially changed in design from their natural state and are suitable for fishing purposes, while poles left intact, whether processed or not, are not so changed, and are not suitable for fishing purposes.

Viewed in light of the fishing purposes to which the respective types of poles

---

3. Webster's New International Dictionary, Second Edition, Unabridged.

can be put, the distinction made above seems unpersuasive. True, it requires more manufacturing effort to cut the poles and install interlocking ferrules. But it improves the utility of the pole for fishing not one whit, according to all of the recognized authorities in the industry to which we have been exposed. Both forms of poles may be used only for still fishing, and "do not require any special skill or technique since the bait is merely lowered into the water at the pole's length, and due to the shortness of the fishing line only a very limited area of water in relation to where the fisherman is located is available for fishing and the user must wait for the fish to come to and find the bait. Poles are not used for, nor are they adaptable for casting."[4]

Both types of poles are referred to as "fishing poles" in the fishing trade and among fishermen, and as above related, a "fishing pole" has a definite meaning, description, and use, by people in those segments of the fishing industry and public.

On the other hand, the same affidavit quoted above says that "fishing rods" have a definite meaning, description and use in the fishing trade and among fishermen, as follows:

'A fishing rod is a manufactured mechanical apparatus, usually made in sections out of metal, glass or plastic (and also with cane bamboo which is split, heat tempered, glued up in sections and usually impregnated with resins). The casting rod is engineered to take a muscular impulse and to generate centrifugal force which in turn propels a fishing lure a great distance from the caster while the line is being played out through guides from the reel attached to the rod. The rod may be designed as a 'tip-action' rod in which the generation of flexion is limited to an upper portion of the shaft, or as a 'parabolic-action'

rod where the flexion extends over the total length of the shaft, or in variations of the two. Rods are equipped with a cork or other type of handle, with a reel seat, and also line guides to retain the fishing line and may be sold with or without a fishing reel; but "if sold without a reel, before using the rod the caster would have to affix a fishing reel. Rods are scientifically designed for their ultimate specific fishing use, such as bait-casting, fly-casting, spinning and spincasting, and many other casting and trolling uses. Rods have handles, reel seats, guides and tip tops. Rods may or may not be constructed with ferrules for convenience. Ferrules perform no function in casting or trolling. Rods with handles, reel seats, guides, tip tops, and reels attached make it possible to cast, play out and retrieve extensive lengths of line, which is not possible with poles not having these characteristics." (Boehm affidavit, pp. 2–3)

Indeed, it appears from the affidavits and documents submitted by plaintiff, that the sole advantage which a segmented pole has over its natural length brother is ease of transportation, a consideration wholly unrelated to the "fishing purposes" criterion relied upon by Rev.Rul. 58–425. There is simply an additional step in the manufacturing process following straightening, scraping and varnishing, to distinguish a segmented pole from an unsegmented one. If manufacturing as a criterion were critical to the Revenue Ruling, presumably it would have distinguished between unsegmented poles which are not straightened, scraped and varnished on the one hand, and unsegmented poles which are so processed, and segmented poles whether processed or not, on the other hand. Seemingly, straightening, scraping and varnishing constitutes "processing * * * or changing the form of the article" within the defini-

---

4. Affidavit of Andrew J. Boehm, Executive Director of the American Fishing Tackle Manufacturers' Association, in support of

Plaintiff's Motion for Summary Judgment, page two.

tion of "manufacturer" in Section 316.4 of Regulations 46, relied upon in Rev. Rul. 58–425, and in *Commerce-Pacific*. But the Rev. Ruling does not consider such steps crucial—only cutting into sections is deemed significant therein.

From the papers submitted, it is clear that if the commercialized or particularized usage meaning is applied, the articles in suit are not "fishing rods". This was recognized in *Simmons*. (308 F.2d at 942).

Furthermore, even if the ordinary meaning test is applied, we believe the latest dictionary definitions of the relevant terms further support plaintiff's position. The dictionary used in *Commerce-Pacific*, Webster's New International Dictionary, Second Edition, Unabridged, was apparently written in 1934.[5] But the most recent edition, Webster's New International Dictionary of the English Language, Third Edition (1961), contains the following new definitions:

> "Fishing pole; a slender tapering pole with a line attached to the tip used in fishing—Compare fishing rod.

> "Fishing rod; A springy tapering often jointed rod (as of wood, split bamboo, or steel) equipped with hand grip and line guides and used with fishing line and reel for catching fish."

In substance, these are the same definitions that plaintiff's affiants have given as the professional or trade definitions, and that an exhibit, McClane's Fishing Encyclopedia, gives. Thus, it appears, that the emphasis placed by the court in *Commerce-Pacific* upon "joints" in construing the poles as "fishing rods", was unwarranted, for rods are, not always, but only "often" jointed, and in addition are equipped with hand grips, line guides and used with a reel.

Poles have no hand grips nor line guides nor reels, but for convenience in transporting, are often jointed. The function of both unjointed and jointed poles is the same, and differs, of course, from that of a rod which is used for casting, and to propel a lure a great distance from the caster while the line is being played out through guides from the reel attached to the rod.

■ Under either test of meaning, the commercial or the everyday, we believe the poles in dispute are not rods. Contrary to the Government's criticism of plaintiff's contention regarding the dictionary definitions, dictionaries do not change the meanings of words. They only chronicle change in usage, which, of course, must precede the chronicle. State v. Olson, 26 N.D. 304, 144 N.W. 661, 668, L.R.A.1918B, 975.

*Simmons* involved § 3406(a) (1), the predecessor to § 4161, which included over thirty items in addition to "fishing rods", rather than the few items now included in the statute. Nevertheless, its rationale is still applicable herein, for the origins of the present inclusions in § 4161 stem from its predecessors. The most relevant and persuasive portion of *Simmons* is quoted below:

> "The statute under construction levies the manufacturers' excise tax upon assorted items of equipment used in sports. An examination of the statute will reveal that practically all of the more than thirty items included in it consist of products of the manufacturing art wherein the raw materials furnished by nature have been fabricated into something entirely different from what nature had provided. This is certainly true of reels, the items with which the crucial word 'rods' is always closely associated in

5. The last publication of the dictionary was copyrighted in 1957, and published in 1958. The publisher's statement, which appears in the 1958 publication of the Second Edition, is dated July 2, 1934 (page iv). The preface in the same volume and written by the Editor-in-Chief is dated at Northampton, Massachusetts, July 2, 1934 (page vi). The newest edition, upon which we rely herein, Webster's New International Dictionary of the English Language, Third Edition, copyrighted and published in 1961, also verifies the fact that the previous edition—the Second—was a 1934 product. (Footnote, p. 6a).

every version of the statute. Iron ore, nickel, the chemicals which form plastics, and many other things are subjected to the art of the manufacturer to produce a reel, and a reel serves a vastly different purpose from that which the raw material could furnish.

"Here, then, seems to be the logical test to be applied in determining what Congress was doing. It was levying an excise tax upon the sale of articles manufactured by processes simple or complex so that something usable would be produced where it did not exist in the form which nature had furnished. Subjected to that test, plaintiff's poles were not rods within the meaning of the statute. When the manufacturer's art was applied to the bamboo pole, it had absolutely no greater utility for fishing than it had as nature had fashioned it. The angler had no better fishing pole after the original pole had been cut in pieces and reassembled than he had before the cutting process was begun.

"That the Commissioner seems to accept this test of enhanced usability seems exemplified by a private ruling issued in 1958, which evidently formed the predicate for the assessment of this tax so many years after the plaintiff had performed the acts now sought to be subjected to the manufacturers' excise tax.

"It is manifestly the idea of the defendant that a pole may be straightened and varnished to make it more usable to a fisherman without incurring tax liability; but if, in addition, a pole is cut into sections purely for convenience in transporting it to the fishing grounds, the tax does apply, although a pole cut in pieces certainly has not more utility to the fisherman, and probably less." (308 F.2d at 943–944).

That discourse, with which we indicated agreement above, impels the Court to accept plaintiff's construction of the statute, and disregard Rev.Rul. 58–425. We are able to see no logical basis for following the I.R.S. position, when its professed test of construction, enhanced usability, is not borne out by the evidence. We can see no other basis for the decision in the Ruling, and are persuaded that the poles manufactured by plaintiff are not "fishing rods" within § 4161.

The Government asserts that the Ruling has the force of law. Strictly speaking, that is only true of Treasury Regulations and interpretations "long continued without substantial change, applying to unamended or substantially re-enacted statutes". 1 Mertens, supra, § 3.20. There is no Regulation involved here at all, much less one which supplements, interprets or subtracts from the statutory language. None of the regulations cited by the Government (§ 316.90 of Treas. Reg. 46 of 1939 Code, and Reg. 48.-4161–1 of 1954 Code) defines "fishing rod". They merely repeat the statutory language.

The 1958 Ruling is not of "long continued" application, and defendant does not argue that it has been tacitly approved by re-enactment of the statute interpreted. The section imposing tax on fishing rods was last enacted in 1954, well prior to the 1958 Ruling. Finally, Senior Judge Duffy of this Circuit, has commented upon the weight to be given Revenue Rulings, in Kaiser v. United States, 262 F.2d 367, 370 (7th Cir. 1958):

"In any event, the so-called reenactment doctrine is more properly applied to regulations, which have the force of law, than to rulings. It has been said that the rules have 'no more binding or legal force than the opinion of any other lawyer' ". [citing United States v. Bennett, 186 F.2d 407–410 (5th Cir.)]

In view of all of the above factors, we grant plaintiff's motion for summary judgment in the amount of $50,422.51.